Andres RANGEL, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–96–400–CR.

Court of Appeals of Texas,
Corpus Christi.

May 28, 1998.

Rehearing Overruled Aug. 6, 1998.

Dennis Sliter, Corpus Christi, Kathleen O. Matey, Corpus Christi, for Appellant.

Carlos Valdez, Dist. Atty., Corpus Christi, Audrey Mullert Vicknair, Chaves, Gonzales & Hoblit, Corpus Christi, for State,

Before SEERDEN, C.J., and YANEZ and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

Andres "Andy" Rangel was convicted of aggravated assault and sentenced to twenty years in prison.[1] His first point on appeal argues that evidence obtained during a search of his home should not have been admitted because the search was unconstitu-

---

1. Twenty years was the maximum prison sentence for aggravated assault. See TEX. PEN.CODE ANN. § 22.02, § 12.33(a) (Vernon 1994).

tional. His second point argues that the trial court erred in supplementing its charge to the jury during jury arguments, and the third point alleges ineffective assistance of trial counsel. We overrule these points and affirm the conviction.

## Facts

Much of the evidence in this case came from accomplice witness Tony Soliz, who accepted a plea bargain of seven years in exchange for his testimony. Other evidence was provided by police officers regarding their knowledge of gang activity in the area and their investigation of the events of the night in question. Objects obtained during the challenged search were also entered into evidence, including the butt of a shotgun or rifle and a hacksaw. A statement given by Rangel to police wherein he admitted his involvement in the crime was also entered into evidence.

Rangel was a member of a gang called "Los Mafiosos" that had a history of violent conflicts with a gang called "I.B.K." Rangel lived in a house that was known to local police to be a hangout for the Mafiosos gang. The day of the alleged offense, Tony Soliz, who was a member of a gang called "C.A.S.A.," was walking near an I.B.K. hangout when several I.B.K. members tried to attack him. Soliz ran and encountered a car driven by Joe Hernandez. Hernandez, who is Rangel's uncle and a leader of the Mafiosos gang, stopped to assist Soliz. The I.B.K. members began throwing bottles and bricks at Hernandez's car. Ruby Lopez, who was Hernandez's girlfriend and a passenger in the car, was injured in the attack.

Soliz testified that he went to Rangel's house later that night to see if Lopez was there and to see if she was all right. Hernandez was present at the house, and Hernandez demanded that Soliz participate in retaliation against I.B.K. or else face an attack himself. Soliz found Rangel and Leonard Barron in a back bedroom sawing the butt off of a shotgun. Rangel told Soliz that they wanted to do a drive-by shooting

against I.B.K. and that they wanted Soliz to be the driver. Soliz drove to a spot near, but out of sight of, the I.B.K. hangout, where he let Barron and Rangel out of the car. Soliz testified that before getting out of the car Rangel told him "I better not leave or else he—I knew what was going to happen to me." Soliz testified that Rangel was carrying the sawed off shotgun and Barron was carrying a baseball bat. Soliz waited, heard a loud bang, and then saw Rangel and Barron return, again with Rangel carrying the gun and Barron carrying the bat.

## The Emergency Search

Police officers Randy Ford and Joe Hendrix, who were both members of the "Juvenile Enforcement Team" that concentrated on dealing with gangs, conducted two searches of Rangel's house. The first search was conducted shortly after the shooting when no one was home, without a warrant or consent. During this search they noticed the butt of a shotgun and a hacksaw in a back bedroom. They exited the house and prevented anyone else from entering it. A short while later Grace Garcia, the owner of the house and Rangel's mother, returned home. She gave her consent to a search of her house, and the hacksaw and shotgun butt were taken by the police.

Appellant moved to suppress the evidence seized on the grounds that the searches were unconstitutional. The State's contention, both at the hearing on the motion to suppress and on appeal, is that the first search was justified by the reasonable belief of the police officers that immediate aid to a person located within the area to be searched was necessary, and the second search was legal because Garcia gave her consent. Appellant disputes whether an emergency situation necessitated the first search, and contended that the second search was non-consensual and "poisoned" by the illegality of the first search, in that the impetus for the second search was to seize items seen during the first search.[2]

---

2. See, e.g., *Gonzalez v. State*, 588 S.W.2d 355, 360–61 (Tex.Crim.App.1979) (when second search, although consensual, comes at the exploi-tation of a previous illegal search and cannot be purged of the primary taint, second search is illegal as "fruit of the poisonous tree").

In reviewing a ruling on a motion to suppress evidence, we view the evidence in the light most favorable to the trial court's ruling. *Green v. State,* 615 S.W.2d 700, 707 (Tex.Crim.App.1980). Because the trial judge is the sole fact finder at a hearing on a motion to suppress evidence obtained in a search, an appellate court is not at liberty to disturb any finding supported by the record. *Alvarado v. State,* 853 S.W.2d 17, 23 (Tex. Crim.App.1993). The trial court is the exclusive finder of fact and may choose to believe or disbelieve any or all of a witness's testimony. *Meek v. State,* 790 S.W.2d 618, 620 (Tex.Crim.App.1990); *Henson v. State,* 915 S.W.2d 186, 194 (Tex.App.—Corpus Christi 1996, no pet.). We will not reverse the trial judge's decision on the admissibility of the evidence unless the judge clearly abused his discretion. *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990).

 The Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution forbid unreasonable searches and seizures. In very limited circumstances an immediate search without a warrant is reasonable because of a risk of injury or death, a risk that would be magnified if the search was delayed due to the time involved in obtaining a warrant. *Brimage v. State,* 918 S.W.2d 466, 500 (Tex. Crim.App.1996). Situations justifying an unwarranted search usually include some factors pointing to some danger to the officer or victim, an increased likelihood of apprehending a suspect, or the possible destruction or removal of evidence. *McNairy v. State,* 835 S.W.2d 101, 107 (Tex.Crim.App.1991). The police may seize any evidence that is in plain view during the course of a warrantless emergency search. *Id.* at 501 (citing *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). We use an objective standard of reasonableness in determining whether a warrantless search was justified under the emergency doctrine, taking into account the facts and circumstances known to the police at the time of the search. *Brimage,* 918 S.W.2d at 501.

 Hendrix and Ford heard a bulletin that a drive-by shooting had occurred at the I.B.K. hangout and, based on a description of the suspects involved, they suspected that Rangel and Hernandez were the perpetrators and proceeded to the Mafioso hangout where Rangel lived. Their purpose in going to the house was to confront the suspects and to check for victims of a possible exchange of gunfire. When they arrived at the house the lights were on and the door and windows were open, but no one seemed to be home. This struck the officers as unusual and "not right" because, in their experience dealing with the Mafiosos, someone would usually be present on the front porch or in the front room who would be "on the watch out for other retaliations." On the few occasions that no one was home, the house was always closed and locked. The officers approached the house and identified themselves as police several times without receiving an answer. They decided that they needed to check the house for victims and entered, finding no one in the house. They did see the shotgun butt and the hacksaw in plain view in a back bedroom of the house.

The police articulated several reasons for their concern that victims might be present inside the house. They suspected that Mafiosos were responsible for the drive-by shooting against I.B.K., and they knew that frequently the occupants of a house under drive-by attack shoot back at those shooting at them. It was also common for a drive-by shooting to be followed by a retaliatory drive-by shooting. Furthermore, when gang members were injured they frequently proceed first to a gang hangout rather than directly to a hospital. On cross-examination, Rangel emphasized that the house appeared undisturbed, with no signs that violence had occurred there, such as drops of blood, ammunition casings, or bullet holes, and that the police had not obtained any report of anyone actually hurt at Rangel's house.

Viewing the evidence in the light most favorable to the trial judge's ruling, we believe the trial judge was within his discretion in finding that exigent circumstances did justify the initial search and in denying the motion to suppress. Appellant argues that the search was premised on suspicions and past experience that had no connection to the specifics of this case, rather than factual

conditions. We do not agree with this characterization of the evidence. The past experience of the officers who specialized in gang activity is relevant to evaluating the potential for an emergency situation. The police knew that a feud existed between I.B.K. and the Mafiosos, and they knew from their experience what sort of reactions to expect from those involved, specifically, that I.B.K. was likely to shoot back at the Mafiosos. They also knew that, if injured, Mafiosos were likely to retreat to their gang hangout rather than go to a hospital.

Although the police were not certain that any victims would be found inside the house, we do not believe the police must be certain that an emergency situation exists before conducting an emergency search. In *Brimage,* the Court of Criminal Appeals found no abuse of discretion in the trial court's refusal to suppress evidence taken during a search where the police thought, but could not be certain, that entering Brimage's house might help alleviate an emergency situation. *Brimage,* 918 S.W.2d at 503. In *Brimage,* the police knew that the car belonging to a woman who had been missing for two days was found parked near Brimage's home, and that Brimage had previously attempted sexual assault on another woman. The missing woman was last seen wearing a red blouse, the color of which matched a piece of bloodstained red cloth found in a suitcase Brimage had recently abandoned at a local motel. The police also had a report from a local judge[3] who had searched Brimage's house that pieces of women's clothing and signs of a violent struggle had been seen in Brimage's bedroom. *Id.* at 501–02. They also knew that the house was unoccupied when the judge had recently searched it. *Id.* at 502. The Court of Criminal Appeals ruled that there was "a reasonable *possibility* that complainant was injured, in need of assistance, and *possibly* located inside appellant's residence (or information as to her whereabouts could reasonable be expected to be uncovered by a search of appellant's residence.)" *Id.* (emphasis added) *Brimage* makes clear that there need only be a reasonable *possi-*

*bility* that the search will alleviate an emergency situation.

In this case, the police officers' knowledge of gang habits and gang activity in the area caused them to be concerned that someone might be present inside the house who was seriously injured, either by return of fire from the shooting at the I.B.K. house, or by a retaliatory strike at the Mafioso house. That the police had no actual evidence of injuries suffered by Mafiosos does not alter the reasonableness of their concern that injured persons could be present inside the house. Because we find no abuse of discretion in the trial court's determination that the first search was justified by exigent circumstances, appellant's argument that the second search was poisoned by the illegality of the first is moot.

### Consent to Search

■ Next we consider whether Grace Garcia's consent to the second search was freely given. A consent to search given freely and voluntarily, and not obtained by exploitation of a preceding illegality, is an exception to the requirement of a warrant and probable cause for a valid, lawful search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). If the State relies upon a search conducted pursuant to consent, the State must prove the voluntariness of the consent to search by clear and convincing evidence. *State v. Ibarra,* 953 S.W.2d 242, 245 (Tex.Crim.App. 1997). This burden requires the State to show that the consent given was positive and unequivocal, and not the result of duress or coercion. *Allridge v. State,* 850 S.W.2d 471, 493 (Tex.Crim.App.1991). Voluntariness is a question of fact to be determined from the totality of the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041.

■ We conclude that the trial court did not abuse its discretion in overruling appellant's motion to suppress with respect to the issue of Garcia's consent to the second search. When Garcia returned to her home,

---

**3.** The judge was Brimage's uncle. He broke into Brimage's house and searched it on his own initiative.

the police had "secured" the house and were prohibiting everyone, including Garcia, from entering. Garcia testified that no one informed her that she had the right to exclude the police from her home. However, on cross-examination she admitted that she knew she did not have to let the police in the house if she did not want to. She also indicated that she was already familiar with the consent form that was presented for her signature because she had signed them in the past. Officer Ford testified that Garcia was informed of her right to refuse consent, and that she understood her right. Garcia signed a form that indicated her consent to allow police to search her house and seize evidence from it. The form appears to have been mispositioned during photocopying and consequently has a few words missing. Nevertheless, the advisement of the right to refuse consent, the waiver of those rights, and consent to a search are clear.[4]

Appellant argues that Garcia's consent was not voluntary due to various circumstances present at the time, including (1) she was excluded from her house (2) her daughter and three of her daughter's friends were detained in a police car, (3) she was told that she "needed" to sign the consent forms, and (4) she was confronted by at least four officers, two of whom were armed.

There was no evidence that Garcia's temporary exclusion from her home meant that her consent was given under duress and coercion. She did not testify that she expected to be excluded from her home for any extended period of time, nor did she testify that she thought the only way she could regain access to her home was by giving her consent to the search. Regarding the status of the girls in the police car, one of the girls, Pauline Muro, testified that the police told her and the other girls that if they did not tell the police "where the guys were," they would be "locked up." However, Officer Ford testified that the girls were being detained to prevent contamination of evidence within the house. In any event, there was no evidence that the status of the girls influenced Garcia's decision to sign the consent form.

We also see no indication of coercion from the police officers' statement that Garcia "needed" to consent to the search. It was, of course, necessary that Garcia consent, otherwise the police would have been prohibited from conducting the second warrantless search. If Garcia was under the impression that the statement that she "needed" to sign the consent form indicated that she had no choice in the matter, the admonishments on the consent form should have served to correct that misconception. In fact, Garcia's own testimony on cross-examination was that she knew she had the right to exclude the police from her home.

Similarly, although appellant refers to the presence of the armed officers in arguing that Garcia's consent was involuntary, there was no evidence of any threats or coercion by the officers against Garcia, and the form Garcia signed indicates that her consent was not accompanied by any "compulsion, threats, promises, or persuasion." Viewing the evidence in the light most favorable to the trial court's decision and taking into account the totality of the circumstances, we hold that the trial court did not abuse its

4. The right edge of the document was not copied. As copied, the form states
"I, Grace Garcia, having been informed by the hereafter named Texas peace officer that I ... (words missing) a constitutional right to be free from having him or any other officer ... (words missing) a warrantless search of the hereafter mentioned place under my control ... (words missing) I have a constitutional right to refuse to give him or any other offic ... (letters missing) consent to make a search of that kind and that those rights are guaran ... (letters missing) by both the Texas and Federal Constitution, do hereby authorize Sgt. D. Leal ( & ) Ofc. J. Hendrix and any officers working with him (sic) to conduct a complete search of the following place located in Nueces County, Texas, namely 309 Shawnee (,) and to seize and take from there any item of personal property they b ... (letters missing) to constitute evidence in a criminal proceeding. GG(initials) I have given this consent of my own free will and accord and wit ... (letters missing) being subjected to any compulsion, threats, promises or persuasion of ... (words missing) kind. I know that any items of personal property seized by the above ... (words missing) officer or other officers with him and taken by them from such place ... (words missing) be used against me in a criminal proceeding."
Signed *Grace Garcia* .

discretion in finding that Garcia voluntarily consented to the second search. Appellant's first point of error is overruled.

### Supplement to the Jury Charge

■ Appellant's second point of error contends that article 36.16 of the Texas Code of Criminal Procedure prohibited the trial court from supplementing its charge to the jury during jury arguments. Article 36.16 provides:

> ... After the argument begins no further charge shall be given to the jury unless required by the improper argument of counsel or the request of the jury, or unless the judge shall, in his discretion, permit the introduction of other testimony, and in the event of such further charge, the defendant or his counsel shall have the right to present objections in the same manner as is prescribed in Article 36.15....

TEX.CODE CRIM. PROC. ANN. art. 36.16 (Vernon 1979).

In this case, after the charge of the court was prepared and jury argument began, the State argued for ten minutes, reserving ten minutes for rebuttal. The defense was roughly midway through its argument when the trial judge interrupted and excused the jury. He explained to the attorneys that "in light of the argument that each of you has made, it appears to me that I should instruct the jury on the law of accomplice testimony because Tony Soliz is an accomplice witness as a matter of law." He then asked both the State and the defense if they had any objections, and both stated that they did not.

Article 36.16 has been interpreted to permit the trial court to withdraw and correct its charge if it is convinced an erroneous charge has been given. *Smith v. State,* 898 S.W.2d 838, 854 (Tex.Crim.App.1995). Under Article 36.19, the defendant is only entitled to reversal of the judgment for error in the charge when the error appears from the record to have been calculated to injure the rights of the defendant, or if it appears that the defendant has not had a fair and impartial trial. TEX.CODE CRIM. PROC. ANN. art. 36.19 (Vernon 1979). In this case, adding a charge on the law of accomplice witness testi-

mony benefitted the defendant and increased the fairness of the trial. Before the judge supplemented his charge, the jury could have convicted Rangel based solely on the testimony of the accomplice witness. After the supplementation, the jury was instructed that evidence corroborating the accomplice witness's testimony was also needed for a conviction. Therefore, the error, if any, was not calculated to injure the rights of the defendant and did not damage the fairness of his trial. Appellant's second point of error is overruled.

### Ineffective Assistance of Counsel

Appellant's third point of error alleges ineffective assistance of counsel. Appellant identifies several incidents wherein his counsel was allegedly deficient:

(1) counsel made no request for findings of fact and conclusions of law at the end of the hearing on the motion to suppress;

(2) counsel did not object to the consent form signed by Grace Garcia, which appears to have words missing;

(3) counsel did not request a statement of facts from the suppression hearing, which forfeited an opportunity for more time to prepare for trial;

(4) counsel did not make an opening statement nor call any witnesses during the guilt/innocence segment of the trial;

(5) counsel failed to take the necessary steps to obtain a jury issue on the questions of whether the search of Rangel's house and the taking of his statement were lawfully conducted;

(6) counsel failed to request an instruction to the jury on the law of accomplice witness testimony;

(7) counsel failed to notice that the defendant was referred to by the wrong name on the jury charge;

(8) counsel did not object to the admission into evidence of a letter written by the victim, the text of which was of little probative value, yet was highly prejudicial;

(9) counsel failed to interview his chief witness at the suppression hearing, Grace

Garcia, prior to the suppression hearing; and

(10) counsel failed to contact and call as witnesses several individuals who would have testified in Rangel's behalf during the punishment phase of the trial.

■ A defendant in a criminal trial is entitled to reasonably effective assistance of counsel. *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App.1986). We evaluate ineffective assistance claims in the pretrial and guilt/innocence phases under a two-part test described in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To succeed on an ineffective assistance challenge, the appellant must show (1) that his counsel made such serious errors that he was not functioning effectively as counsel, and (2) that the deficient performance prejudiced the defense such that confidence in the outcome of the trial is undermined. *Strickland*, 104 S.Ct. at 2064, 2068. We must consider the totality of the representation, not isolated incidents of error. *Id.* at 2068–69. The appellant must overcome a strong presumption that counsel's conduct falls within the range or reasonable representation. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex.Crim.App.1996). Any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.*

■ When examining appellant's allegation of ineffective assistance during the punishment phase, we apply the standard expressed in *Ex parte Duffy*, 607 S.W.2d 507 (1980). The standard under *Duffy* is whether the defendant received reasonably effective assistance of counsel. *Duffy*, 607 S.W.2d at 516. There is no requirement under *Duffy* that a defendant show prejudice—that but for counsel's performance the outcome of the proceeding would have been different—as is required under the second prong of *Strickland*. *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex.Crim.App.1996). Under the *Duffy* analysis, we must still consider the totality of the representation as it impacts the punishment phase of the trial. *Ex parte Walker*, 777 S.W.2d 427, 432 (Tex.Crim.App.1989).

We will first discuss Rangel's nine allegations of error in the pretrial and guilt/innocence phase, and then turn our attention to Rangel's final allegation concerning error in the punishment phase. We will discuss each of these matters individually, and then consider the totality of the representation.

■ Regarding the first point, appellant has failed to explain how the failure to request findings of fact and conclusions of law was detrimental to his defense. In any event, the trial court did eventually make written findings and conclusions after the trial was concluded. Any error by appellant's counsel in this instance was insignificant.

■ The consent form signed by Grace Garcia appears to have been mispositioned during photocopying, with the result that one or two words are missing off the right side of each line. However, as we noted earlier, despite the words missing on the form, the advisement of the right to refuse consent, the waiver of that right, and consent to a search are clear from the form. Furthermore, Garcia testified that she knew she did not have to allow the police to search her house if she did not want to, and the police testified that they explained to her the right to refuse consent and that she understood her right. It is apparent from the record that an objection to the consent form would have been futile.

■ Regarding the failure of counsel to delay the trial and allow himself more preparation time by requesting a statement of facts from the suppression hearing, we note that there is nothing in the record to indicate that counsel needed more preparation time. Therefore the record does not support the proposition that counsel was deficient in failing to seize an opportunity to delay the trial. Also, appellant does not explain how his defense would have benefitted from an opening statement or the calling of any witnesses during the guilt/innocence phase. The record is devoid of any indication of any witnesses that, if called, would have been helpful to appellant's case during the guilt/innocence phase. The failure to call witnesses is irrelevant to an ineffective assis-

tance challenge when the defendant fails to show there were witnesses not called who would have testified on his behalf, and that these witnesses were available. *King v. State*, 649 S.W.2d 42, 44 (Tex.Crim.App. 1983).

 We agree with appellant that his counsel should have taken steps to create a jury issue on the legality of the search of his house and the recording of his statement to police.[5] Even though appellant's motion to suppress was denied, appellant was still entitled to a jury issue on the admissibility of this evidence if he could raise a fact issue on whether the evidence was legally obtained. Tex.Code Crim. Proc. 38.22–23 (Vernon 1979 & Pamph.1998); *Butler v. State*, 872 S.W.2d 227, 236 (Tex.Crim.App.1994). Favorable jury findings on the admissibility of this evidence would have removed some of the evidence corroborating the accomplice witness's testimony from this case. Of course, the record does not indicate that the jury would have found in appellant's favor on these issues. The record does indicate that appellant's counsel made a competent effort to have this evidence suppressed before trial. We will defer further consideration ·of this matter until we have touched on all of the errors alleged by appellant, at which time we will consider the "totality" of the representation.

 Next, appellant faults his counsel for failing to request a jury instruction on the law of accomplice witness testimony, and refers us to *Ex parte Zepeda*, wherein the failure of counsel to request an accomplice witness jury instruction led to a reversal of Zepeda's conviction for ineffectiveness of counsel. *Ex parte Zepeda*, 819 S.W.2d 874, 877 (Tex.Crim.App.1991). However, *Zepeda* is distinguishable from this case in significant ways. First, in *Zepeda* none of the non-

accomplice testimony tended to connect the appellant to the commission of the crime. *Id.* at 876. In this case, corroborating evidence was present in the form of the hacksaw and the shotgun butt found in the back bedroom of the house, and appellant's statement, which admitted participation in the planning and commission of the crime.[6] Secondly, in this case, the jury was instructed on the law of accomplice witness testimony, despite the failure of counsel to request such an instruction. Appellant contends that the placement of the court's supplemental charge on the law of accomplice testimony "as an afterthought, separate from the remainder of the charge" undermined its impact on the jury. However, there is nothing in the record to indicate that the jury failed to take the supplemental charge into account, or afforded it any less weight than the rest of the charge. We conclude that *Ex parte Zepeda* is not controlling over the facts of this case. Counsel's error in failing to request a jury instruction on the law of accomplice witness testimony was largely cured by the trial court's charge supplement, and also largely inconsequential in light of the corroborating evidence present in this case.

 Next, we consider counsel's failure to notice that appellant was referred to by the wrong name in the original draft of the jury charge. At one point in the jury charge appellant was referred to as "Andy Garcia" rather than Andy Rangel. The victim of the crime, Abel Garcia, was mentioned a short space above the spot where appellant is referred to as "Andy Garcia." The trial court corrected its error before the charge was submitted to the jury. Obviously the appellant was not harmed by his counsel's failure to spot the error.

---

5. Appellant also suggests that, by failing to object at trial, appellant may have waived his right to complain on appeal about the inadmissibility of this evidence. That is incorrect. When a pre-trial motion to suppress is denied, the accused does not need to subsequently object to the admission of the same evidence at trial in order to preserve error. *Livingston v. State*, 739 S.W.2d 311, 334 (Tex.Crim.App.1987).

6. In his statement, appellant admitted participating in the planning of the crime and preparations for it, such as sawing off the butt of the shotgun. Appellant admitted his presence during the commission of the crime, but claimed he thought they would only damage a truck parked at the I.B.K. house, not shoot into the house, and that Leonard Barron had fired the gun, not him. This statement tends to connect him with the offense committed. Tex Code Crim. Proc. Ann. art. 38.14 (Vernon 1979).

■ We next consider counsel's failure to object to the admission of the text of a letter the victim, Abel Garcia, was writing in the front room when the shotgun blast came into the house. The letter explains that Garcia has decided to turn to God and to convince his friends to change their lives as well. The letter also mentions that his friends had been threatened by "some guys" that wanted to kill them, and recounts an incident where one of them (identified in Garcia's testimony as appellant) hit Garcia with a car while Garcia was riding his bicycle and then tried to steal the bicycle. Appellant contends that this letter had no probative value to the guilt/innocence phase, but could have inflamed the jury with sympathy for the victim. While we agree that portions of the letter may have been objectionable, we note that appellant's counsel chose instead to allow the letter into evidence and then cross-examine Garcia about the letter. On cross-examination Garcia admitted that he had been a gang member and had committed several offenses, and that, even while writing the letter, he continued to live at the I.B.K. hangout. Appellant's counsel may have considered it better strategy to allow the entire letter into evidence so as to make his impeachment more potent. Appellant has failed to show that allowing the letter into evidence could not be considered sound trial strategy. *See Strickland,* 104 S.Ct. at 2065 (defendant must overcome strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy).

■ On appellant's last point from the guilt/innocence phase, we agree that failing to interview the defense's chief witness, Grace Garcia, before the suppression hearing was a deficient act by appellant's counsel. However, we must also note that Garcia's testimony was only relevant to whether she had given her consent for her house to be searched. The trial court found, and we have affirmed, that the police were entitled to search Garcia's house prior to her consent due to the emergency situation present. Appellant's challenge to the emergency search depended entirely on cross-examination of the State's witnesses, which counsel conducted in a competent manner.

Viewing the totality of the representation, we find a few, isolated errors on the part of appellant's counsel which had a negligible effect. There were also instances where counsel performed well, such as during cross-examination of the accomplice witness, where he prompted the witness to admit that his testimony was inconsistent with prior statements he had given, and that he had a significant incentive to give false testimony in appellant's trial.[7] There was nothing lacking in his cross-examination at the suppression hearing, which arguably was the best chance for appellant to escape conviction since the challenged evidence comprised much of the State's corroborating evidence. We conclude that appellant's trial counsel did not commit such serious errors during the guilt/innocence phase that he was not functioning effectively as counsel, and counsel's performance was not so deficient that confidence in the outcome of the trial has been undermined. *Strickland,* 104 S.Ct. at 2068.

■ Rangel's allegation of ineffectiveness at the punishment phase centers on the failure of trial counsel to contact other potential witnesses for the punishment phase. Trial counsel called two witnesses at the punishment phase, Rangel's mother and his girlfriend. Their testimony was brief. Rangel's mother testified that her son had been employed prior to this offense, and his girlfriend testified that she continued to love him and would be willing to help him stay self-supporting and out of trouble. Rangel argues that trial counsel should have called other witnesses to testify on his behalf.

■ Among counsel's duties is that of making an independent investigation of the

---

7. The witness explained that he was under a great deal of pressure at the time he made the previous statements, and had lied because he was afraid. Counsel then impeached the witness as follows:

> Counsel: Aren't you scared now?
> Witness: I'm scared now.

Counsel: Are you any more scared now than you were then?
Witness: Yes, sir.
Counsel: So you would be less likely to tell the truth now than you would then?
Witness: Yes, sir.

facts of his client's case. *Butler v. State*, 716 S.W.2d 48, 54 (Tex.Crim.App.1986); *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex.Crim.App. 1978). As part of this duty, counsel has a responsibility to seek out and interview potential witnesses. *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex.Crim.App.1990).[8]

■ Obviously, if trial counsel fails to seek out and interview potential witnesses, the trial record is unlikely to indicate trial counsel's deficiency. One method of developing evidence of counsel's ineffectiveness not otherwise apparent from the record at trial is by motion for new trial and an evidentiary hearing thereon. *See Phetvongkham v. State*, 841 S.W.2d 928, 932–33 (Tex.App.— Corpus Christi 1992, pet. ref'd, untimely filed). However, before the trial court is required to hold an evidentiary hearing, a motion for new trial alleging ineffective assistance of counsel based on conduct not already apparent in the record must be supported by an affidavit of either the accused or someone else specifically showing that reasonable grounds exist for granting relief. *Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim.App.1994); *Reyes v. State*, 849 S.W.2d 812, 816 (Tex.Crim.App.1993); *Sandoval v. State*, 929 S.W.2d 34, 36 (Tex.App.—Corpus Christi 1996, pet. ref'd).

In this case, sentence was imposed on August 21, 1996, and appellant then had thirty days to file a motion for new trial. TEX. R.APP. P. 21.4.[9] Appellate counsel filed a timely motion for new trial on September 19, 1996, including as a ground for new trial that Rangel was denied effective assistance of counsel at the punishment stage of his trial. The State then moved to deny a hearing on the motion for new trial, pointing out that Rangel failed to support his motion with affidavits. The trial court agreed with the State and refused to hear Rangel's motion. Then on October 25, 1996 appellate counsel filed an untimely Motion for Leave to File an Amended Motion for New Trial, wherein she

did specify particular witnesses that could have been called at the punishment phase and provided affidavits to show witness testimony and trial counsel's lack of diligence in inquiring about potential witnesses. The trial court on October 31, 1996, signed an order allowing the filing of the amended motion but denying the motion without a hearing.

■ With regard to the amended motion in this case, rule 21.4 allows the defendant to file amended motions within 30 days after the date the trial court imposes or suspends sentence in open court but before the court overrules any preceding motion for new trial. TEX.R.APP. P. 21.4(b). Even where the original motion for new trial is timely, an untimely amended motion for new trial is a nullity and cannot form the basis for points of error on appeal. *Dugard v. State*, 688 S.W.2d 524, 529–30 (Tex.Crim.App.1985) (overruled on other grounds by *Williams v. State*, 780 S.W.2d 802, 803 (Tex.Crim.App.1989)); *Kiser v. State*, 788 S.W.2d 909, 915 (Tex.App.— Dallas 1990, pet. ref'd). Accordingly, no amended motion for new trial may be filed after the 30–day period, even with leave of court. *Drew v. State*, 743 S.W.2d 207, 222– 23 (Tex.Crim.App.1987); *Dugard*, 688 S.W.2d at 530;; *Belton v. State*, 900 S.W.2d 886, 902 (Tex.App.—El Paso 1995, pet. ref'd); *Pena v. State*, 767 S.W.2d 206, 207 (Tex.App.—Corpus Christi 1989, no pet.). In this case, even though the trial court purported to grant leave to file, the amended motion was untimely and a nullity. Therefore, we may not consider the affidavits attached to the amended motion.

A defendant may base an ineffective assistance claim on an attorney's failure to present witnesses only if the defendant can show that the witnesses were available and their testimony would have benefitted the defendant. *Hunnicutt v. State*, 531 S.W.2d 618, 625 (Tex.Crim.App.1976). Appellant has failed to meet his burden of presenting us

---

**8.** *Butler, Ewing,* and *Welborn* were all decided under the *Strickland* standard for ineffective assistance of counsel. However, if counsel has the duty to seek and investigate potential witnesses for the guilt/innocence phase, we perceive no reason why the same duty should not apply during the punishment phase.

**9.** Prior rule 31(a), which was substantively the same as rule 21.4, was in effect when appellant filed his motions.

with a record that shows ineffective assistance of counsel at the punishment phase by establishing the availability of beneficial witnesses who were not called. Appellant's first motion for new trial was unsupported by affidavits, and the amended motion may not be considered because it was untimely. Finding no ineffective assistance of counsel from the record before us, we overrule appellant's third point of error.

The judgment of the trial court is AFFIRMED.