

NUMBER 13-07-00581-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**KIRK JOHN NORTHUP,**                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                      **Appellee.**

## On appeal from the 36th District Court
## of Aransas County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant, Kirk John Northup, was convicted by a jury of robbery. *See* TEX. PENAL CODE ANN. § 29.02(a) (Vernon 2003). The trial court sentenced Northup to twelve years' confinement and assessed a $500 fine. By four issues, Northup contends that his trial counsel provided ineffective assistance, and that the evidence is legally and factually

insufficient to sustain his conviction. We affirm.

## I. BACKGROUND

In the early morning hours of June 4, 2007, the Aransas County Sheriff's Office received a 911 call from Casey Peebles, a local cab driver, reporting that he had been robbed. The Rockport Police Department was notified, dispatched an officer, and began an investigation. On July 24, 2007, Northup was indicted for aggravated robbery. Trial commenced on September 5, 2007.

### A. The State's Case

The State's first witness was Patty Dunn, an Aransas County Sheriff's Office dispatcher. Dunn testified that between three and four o'clock in the morning on June 4, 2007, she received a 911 call from Peebles. As soon as she answered the call, Peebles stated, "I've been robbed." Dunn testified that Peebles sounded "scared, upset, and trembling" as he recounted that he had been robbed by a man he had been transporting in his cab. Peebles told Dunn that he thought the man had a knife. Peebles described the man as a white male in his mid-thirties, wearing a black shirt and blue jean shorts. Dunn stayed on the line with Peebles until an officer arrived on the scene.

Peebles, an employee of City Cab, testified that he was dispatched to Oak Crest Nursing Home around three o'clock in the morning on June 4, 2007. When he arrived at the nursing home, a man, who he later identified as Northup, was standing close to the street in front of the facility. Northup approached the driver's side of the cab and asked to be taken to Aransas Pass. Northup appeared nervous, so Peebles requested an up front payment. Northup asked if Peebles had change for a $100 bill. Peebles responded that

2

he did not, but offered to take Northup to a nearby convenience store for change. Northup boarded the cab and sat in the front passenger seat.

About one quarter of a mile down the road, Northup asked to borrow Pebbles's cell phone. Peebles obliged and continued driving. After driving less than another one quarter of a mile, Northup asked Peebles to stop, and stated, "I don't want to hurt you. I just want your money." Peebles looked at Northup and saw something that resembled a knife or box cutter in Northup's hand. Peebles complied and gave Northup eighteen dollars. As Northup exited the cab with the money and Peebles's cell phone, Peebles attempted to spray him with pepper spray that contained an orange dye. Peebles thought that he had sprayed Northup, but Northup ran across the street towards the Gulfway Trailer Park. Peebles testified that he saw what Northup looked like because of the light provided by streetlights and a strip of lights attached to the dashboard of his cab.

Peebles then testified as to what happened after Officer Yarnall arrived at the scene. Peebles told the officer that Northup had a tattoo on his left arm and that he thought that he sprayed Northup with pepper spray. Peebles assisted the officer by contacting the dispatcher of the cab company to identify the telephone number of the person who requested the cab. The number was not available on the dispatcher's caller ID, but the owner of the cab company found it by checking the phone company's website. Officer Yarnall returned to his patrol car and conducted a computer search of the telephone number. Peebles stood outside the patrol car and smoked a cigarette while Officer Yarnall searched for who the number belonged to. At one point, Peebles saw a picture on the computer screen that he recognized as the assailant. Upon seeing the picture, he exclaimed, "That's the individual that robbed me right there." Officer Yarnall identified the

3

individual as Northup.

On cross examination, Peebles stated that he had been asleep when the cab company dispatched him to Oak Crest Nursing Home. He admitted that he never specifically told police that Northup fled across the street to Gulfway Trailer Park; he conceded that he had only told the officers that Northup fled in that general direction. He also admitted that the lights inside his dashboard did not work, and that prior to the morning of the incident, he installed a strip of lights to the dashboard that provided lighting in the front seat. Additionally, Peebles stated that when the picture of Northup appeared on Officer Yarnall's computer, Peebles was not aware of the location to which the telephone number was attached, and was only aware that the person in the picture was associated with the telephone number where the cab request had originated.

Officer Yarnall testified that he received a dispatch at 3:04 a.m. indicating that a robbery had occurred. Officer Yarnall's testimony concerning the information relayed to him by Peebles is substantially similar to the testimony given by Peebles. Additionally, Officer Yarnall testified that after Peebles gave him the telephone number of the call requesting the cab, he obtained the address associated with the number by asking a police dispatcher to do a "reverse 911." Officer Yarnall then entered the address into his computer and a picture of Northup appeared on the screen. He heard Peebles, who was standing outside the patrol car, say, "That's the guy." Officer Yarnall then went to the address, a residence located in a nearby trailer park.

Between three and four o'clock in the morning, Officer Yarnall arrived at the address and knocked on the door. A woman, later identified as Linda King, answered and Officer

4

Yarnall asked her if Northup was there. She responded affirmatively and summoned Northup. When Northup approached the door, Officer Yarnall asked him to step onto the porch. Northup refused, opting instead to stand inside the trailer behind a partially opened door. Officer Yarnall noted that Northup was wearing khaki shorts but was not wearing a shirt and that Northup's hair and upper body appeared wet. He did not see any pepper spray burns on the side of Northup's face, and Northup did not appear to be drowsy or sleepy.

On cross examination, Officer Yarnall testified that upon questioning, Northup said that he had nothing to do with the incident. Northup also told Officer Yarnall that two "friends," known only as "Denise" and "Jeff" had been in the home "earlier in the evening." Officer Yarnall did not ask Northup any additional questions about Denise and Jeff. After this brief encounter with Northup, Officer Yarnall left the residence, and the case was assigned to Detective Jerry Lawing.

Detective Lawing testified that when he arrived at work on the morning of June 4, 2007, he reviewed the offense report with Officer Yarnall. After reviewing the case, Detective Lawing drafted a complaint and took it to a judge. The judge signed the complaint and issued an arrest warrant for Northup. On June 5, 2007 at 8:50 a.m., Detective Lawing executed the warrant. In the course of the investigation, Detective Lawing took a statement from Peebles and tried to contact Linda King. Detective Lawing testified that one day an affidavit from Linda King appeared in his office. He tried to contact King regarding the affidavit, but she was never at home when he went by the residence, and she did not return messages that he left on her phone. Consequently, he

5

was unable to obtain any information concerning Denise and Jeff.

## B.    The Defense's Case

King, Northup's sole witness, testified that on June 4, 2007, Northup was her common law husband, but as of the date of trial, he was her "common-law ex-husband." She testified that she was the owner of the Gulfway Trailer Park residence and had purchased it from Michael Bacon in March 2007.

King stated that between two and three o'clock in the morning on June 4, 2007, both she and Northup were asleep in the living room of the residence because the air conditioner was not working properly. At approximately 2:00 a.m., she heard a knock at the door. When she opened the door, a young couple standing at the door asked for Michael, who formerly owned the residence. King told the couple that Michael no longer lived there. The couple then introduced themselves as Denise and Jeff. Denise was "heavy set," approximately five feet two inches tall, of "mixed race," and had dark, curly hair. Jeff was a white man, approximately five feet eleven inches tall, and "kind of chunky." The couple asked King if she would give them a ride; King declined because she did not know them. King woke Northup and asked him if he would give the couple a ride. Northup also declined. King invited the couple into her residence to use the phone, and Jeff used the phone while she, Northup, and Denise sat on the couch. After Jeff made the call he said, "We have a ride. We have to go." With that statement, the couple departed the residence.

King testified that she and Northup then fell back asleep. King awoke a short time later due to bladder problems and noticed that Northup remained asleep. As she fell back

to sleep, she heard a knock at the door. Upon opening the door, an officer asked to speak to Northup. When she told the officer that Northup was asleep, he told her to wake him up. King complied, and Northup went to the door. King testified that she listened to the conversation between Northup and the officer. The officer asked Northup about his whereabouts for the last one to two hours and asked if there was anyone else at the house. King testified that she told Officer Yarnall that two individuals named Jeff and Denise had been in the residence. Additionally, she testified that after that night, she made an affidavit and sent it to the police department. However, she did not speak to the police because Northup told her not to. King then stated that she was not testifying to help Northup and that her "main concern is not for him; it's for the truth to be known."

Upon cross examination, King testified that Northup had been her common law husband for five years but had become her "ex" several months prior to the trial. She stated, "I get along fine with him; I just don't want to be with him. I'm not in love with him."

## C. The State's Rebuttal

After the defense rested, the State recalled Peebles and Officer Yarnall. Peebles testified that a "chunky" person did not rob him. Officer Yarnall testified that he did not speak to King after she woke Northup and that only Northup mentioned Jeff and Denise.

## D. Procedural History

On September 6, 2007, the jury convicted Northup of robbery. The court sentenced him to twelve years' imprisonment and assessed a $500 fine. On September 17, 2007, Northup filed a pro se Motion for New Trial and a Notice of Appeal. On September 21, 2007, the Aransas County District Clerk notified Northup's counsel that the motions had

been filed. The Motion for New Trial was overruled by operation of law on November 20, 2007. On November 25, 2007, Northup filed an amendment to his Motion for New Trial.

On October 26, 2007, Northup's counsel filed a Motion to Withdraw with this Court. We transferred the motion to the 36th District Court of Aransas County on November 20, 2007. The district court granted counsel's Motion to Withdraw on November 30, 2007. Northup was appointed new counsel for appeal. This appeal ensued.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

In his first and second issues, Northup contends that he received ineffective assistance of counsel because his original counsel failed to: (1) request a hearing on his motion for new trial; and (2) make any argument at the punishment phase of the trial.

## A. Standard of Review

Although the constitutional right to counsel ensures the right to reasonably effective counsel, it does not guarantee errorless counsel whose competency or accuracy of representation is to be judged by hindsight. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). To prove ineffective assistance of counsel, Northup must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). A failure to make a showing under either prong of the *Strickland* standard defeats a claim of ineffective assistance of counsel. *Rylander*, 101 S.W.3d at 110-11.

8

An appellant must prove his claim of ineffective assistance of counsel by a preponderance of the evidence. *Stafford v. State*, 813 S.W.2d 503, 506 n.1 (Tex. Crim. App. 1991). An appellate court's review of defense counsel's representation is highly deferential, and we presume that counsel's actions fell within the wide range of reasonable and professional assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). Allegations of ineffective assistance of counsel must be firmly founded in the record. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The record must sufficiently demonstrate that the acts or omissions of counsel were not the product of strategic decisions; if the record is silent as to any explanation for counsel's actions, a reviewing court will find that the defendant has failed to overcome the strong presumption of reasonable assistance "unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Morales*, 253 S.W.3d at 696-97 (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)); *see Thompson*, 9 S.W.3d at 814; *Jaynes*, 216 S.W.3d at 851.

## B.    Failure to Request a Hearing on the Motion for New Trial

Northup contends that counsel provided ineffective assistance by failing to request a hearing on the motion after receiving a copy of his pro se motion for new trial. Northup filed his pro se motion for new trial while he was represented by counsel. An accused has no absolute right to hybrid representation. *See Scheanette v. State*, 144 S.W.3d 503, 505 n.2 (Tex. Crim. App. 2004) (holding that a defendant has no right to hybrid representation); *see also Ashcraft v. State*, 900 S.W.2d 817, 831 (Tex. App.–Corpus Christi 1995, pet.

9

ref'd) (holding that a trial court is not required to consider the pro se motion of a defendant represented by trial counsel). Accordingly, we find that trial counsel was not ineffective for failing to request a hearing where the trial court was under no obligation to consider the underlying motion. We overrule Northup's first issue.

## C.     Failure to Make Argument at Punishment Phase

Northup's pro se motion for new trial did not include a complaint that trial counsel was ineffective because of his failure to make arguments at the punishment phase, and there was no hearing on the motion. "'Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'" *Goodspeed*, 187 S.W.3d at 392 (quoting *Rylander*, 101 S.W.3d at 111). However, a motion for new trial claiming ineffective assistance of counsel is not always required to preserve that claim. *See Robinson v. State*, 16 S.W.3d 808, 809-10 (Tex. Crim. App. 2000). When an appellant's allegations of ineffective assistance of counsel are firmly founded and affirmatively demonstrated in the record, no evidentiary hearing is required. *See Castoreno v. State*, 932 S.W.2d 597, 605 (Tex. App.–San Antonio 1996, pet. ref'd). Therefore, we address whether the record affirmatively demonstrates ineffective assistance of counsel.

During punishment, the State presented evidence of two prior offenses. Although Northup's counsel did not present any evidence to mitigate the offenses, he requested that a lesser sentence be imposed. Northup contends that his trial counsel was ineffective for failing to "make any meaningful argument" at punishment; however, Northup fails to identify any mitigating evidence that counsel should have presented. Counsel's failure to present

evidence is irrelevant absent a showing that mitigating evidence was available and that Northup would have benefitted from the evidence. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983) (declining to find counsel ineffective for failing to call witnesses during punishment where appellant did not demonstrate that witnesses were available or how he would benefit from their testimony); *see also Rangel v. State*, 972 S.W.2d 827, 835-36 (Tex. App.–Corpus Christi 1998, pet. ref'd) (declining to find counsel ineffective where counsel failed to call witnesses during the guilt/innocence phase because appellant failed to show that there were witnesses available who could have provided helpful testimony). In the absence of evidence that counsel could have offered at punishment, we cannot find that counsel's performance was "'so outrageous that no competent attorney would have engaged in it.'" *See Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007) (quoting *Goodspeed,* 187 S.W.3d at 392). Accordingly, we overrule Northup's second issue.

### III. LEGAL AND FACTUAL SUFFICIENCY

By Northup's third and fourth issues, he challenges the factual and legal sufficiency of the evidence supporting his conviction.

### A. Standards of Review and Applicable Law

In conducting a legal sufficiency review, the reviewing court must ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original)).

11

We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151. We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 417.

Under section 29.02 of the Texas Penal Code, a person commits robbery if, "in the course of committing theft as defined in Chapter 31 and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX. PENAL CODE ANN. § 29.02(a). Chapter 31 of the Texas Penal Code defines the offense of theft as the unlawful appropriation of property with the intent to deprive the owner of the property. *Id.* § 31.03 (Vernon Supp. 2008).

B. **Analysis**

The record indicates Peebles identified Northup as the man who took his money and cell phone. Peebles testified that he was able to identify Northup because street and

12

dashboard lights sufficiently illuminated Northup. Peebles first identified Northup shortly after police arrived on the scene when he saw a picture of a man he recognized as the assailant appear on Officer Yarnall's computer screen. Peebles testified that upon boarding the cab, Northup sat in the front passenger seat. After driving a short distance, Northup asked to use Peebles's cell phone, and although Northup took possession of the phone, he did not use it. Northup then asked Peebles to stop the car and give him money. Peebles testified that he was nervous and that he complied because he noticed that Northup was holding an object that appeared to be a knife or box cutter. Northup then fled the car in possession of Peebles's money and cell phone.

Officer Yarnall testified that he was able to locate the address and occupants associated with the residence where the phone call requesting the cab originated. Northup lived at the residence associated with the telephone number. Officer Yarnall testified that when he asked Northup whether anyone else was at the residence, Northup stated that two friends named Denise and Jeff had been at the residence "earlier in the evening." Although another occupant of the residence, King, testified that "strangers" identified only as Denise and Jeff used the phone at the residence to obtain a ride, no additional evidence was presented as to the identity of the couple. Based on King's testimony, the jury learned that the man's name was Jeff and that he was "chunky." However, Peebles testified that the man who took his money and cell phone was not "chunky."

Viewing this evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Northup had the intent to deprive Peebles of his money and cell phone when he unlawfully appropriated the

13

property, and intentionally or knowingly threatened or placed Peebles in fear of imminent bodily injury or death. *See Laster*, 275 S.W.3d at 518. Viewing the evidence in a neutral light, we cannot conclude that the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or that the jury's verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15. We conclude that the evidence is legally and factually sufficient to support Northup's conviction. We overrule Northup's third and fourth issues.

## IV. CONCLUSION

Having overruled all of Northup's issues, we affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do Not Publish. TEX. R. APP. P. 47.2(b)
Memorandum Opinion delivered and
filed this the 11th day of June, 2009.