David ORTEGA, Appellant,

v.

STATE of Texas, Appellee.

No. 11–92–269–CR.

Court of Appeals of Texas,
Eastland.

Sept. 30, 1993.

Rehearing Denied Oct. 28, 1993.

Isaac M. Castro, Hamlin, for appellant.

Bobby Burnett, Munday, for appellee.

OPINION

DICKENSON, Justice.

The jury convicted David Ortega of delivery of 1.71 grams of cocaine[1] and assessed

---

1. TEX.HEALTH & SAFETY CODE ANN. § 481.-112 (Vernon 1992) defines the offense (delivery of less than 28 grams of a controlled substance) as a felony of the first degree.

his punishment at confinement for a term of 60 years.[2] The indictment did not contain enhancement allegations, but the proof showed three prior felony convictions.[3] We affirm.

## Points of Error

There is no challenge to the sufficiency of the evidence. Appellant argues in two points of error that the trial court erred in denying his motion for new trial. First, he argues that the district attorney knowingly withheld exculpatory testimony. He also argues that the jury, after having retired to deliberate, received other evidence (the effect of "good time and parole") "consisting of a misstatement of the law and resulting in the assessment of increased punishment."

## Background Facts

The State used two witnesses to prove its case. The first witness was Tommy Zane Ruddy, a Jones County Deputy Sheriff, who was a member of the West Central Texas Inter–Local Crime Task Force. The task force was using Agent Ruddy as an undercover narcotics agent in the area which includes Knox County. Agent Ruddy testified that on December 12, 1991, he went to appellant's house with Anthony Randall[4] to purchase an "eight ball" (⅛th ounce) of cocaine from Freddie Garcia. Agent Ruddy stated that appellant helped Garcia negotiate the sale and that Garcia gave appellant some of the $275 which was paid for the cocaine. The sale took place at appellant's home, and appellant handed the cocaine to Agent Ruddy after Agent Ruddy handed the money to Garcia. Agent Ruddy proved-up the chain of custody to and from the chemist. The other witness was the chemist, and he testified that the substance which was submitted to him by

Agent Ruddy was cocaine which weighed 1.71 grams.

Appellant sought to examine Randall, but he invoked his rights under the "fifth amendment" and refused to answer.

Appellant testified in his own defense. Appellant agreed that Agent Ruddy was at his house, but he denied the material allegations made in the indictment and Agent Ruddy's testimony. Appellant testified that there was no sale or delivery of cocaine and that the only money which changed hands was $20 that Agent Ruddy paid Garcia to satisfy a debt owed by Randall. The jury resolved the conflicts in the testimony by rejecting appellant's version and accepting Agent Ruddy's testimony.

## Exculpatory Evidence

Appellant contends in his first point of error that he should have been granted a new trial because the State suppressed the testimony of a witness favorable to the defense in violation of TEX.CODE CRIM.PRO. ANN. art. 2.01 (Vernon Supp.1993) and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

At the hearing on appellant's motion for new trial, his attorney called the district attorney as an adverse witness. Relevant portions of that testimony show the following questions and answers:

Q: [During the trial of appellant] Freddie Garcia was held in the Baylor County jail, is that right?

A: He was transported from the Texas Department of Criminal Justice, I think, at about that time and remained in the Baylor County jail for two or three days to the best of my recollection.

Q: And what was the purpose of him being in the Baylor County jail?

**2.** TEX.PENAL CODE ANN. § 12.32 (Vernon Supp.1993) provides that a person convicted of a felony of the first degree shall be punished by confinement for life, or for a term of not less than 5 nor more than 99 years. In addition to imprisonment, a fine of not more than $10,000 could have been assessed.

**3.** The prior convictions were: burglary of a building in Hockley County, probation revoked and sentenced to three years confinement in

1981; criminal mischief in Hansford County, sentenced to two years confinement in 1985; and felony driving while intoxicated in Knox County, sentenced to four years confinement in 1989.

**4.** Randall is a "cooperating individual" who was in trouble with the law and who assisted the undercover narcotics agent in the hope that he would receive leniency in connection with the charges which were pending.

A: Well, we thought we might call him as a witness in this case.

Q: And why couldn't he have been held here in the Knox County jail?

A: Well, when my investigator, Mr. Styles, went to Huntsville, Seymour is closer to Huntsville and Mr. Styles lives in Seymour and it was just easier to put him in the Baylor County Jail than to have the additional time and expense of driving to Knox County.

Q: Isn't it true, Mr. Burnett, that you did not ever advise me that Freddie Garcia was in the Baylor County jail.

A: You know, it could be. I probably did not. We were not even sure until the time that Mr. Styles actually picked Freddie Garcia up that we were even going to get him up here, and like I said, that was right before the trial was to commence. I had a lot of things on my mind and it probably never even occurred to me to tell you that, but had you asked the whereabouts of Freddie Garcia, there's no doubt in my mind that I would have told you where he was.

Q: Well, pursuant to my discovery request, you had advised me that he was in the Texas Department of Criminal Justice, isn't that right?

A: Yes, that's where he was.

\* \* \* \* \* \*

Q: And isn't it true that Freddie Garcia wanted to testify at the trial of this case?

A: I have no idea whether he wanted to testify or not. When we interviewed him, he was completely uncooperative and so we decided not to use him.

Q: He was not cooperative in favor of the State?

A: He was not cooperative in that he would not answer our questions about anything.

Q: Well, isn't it true, Mr. Burnett, that his testimony in this case would have been exculpatory to this defendant?

A: Oh, I don't think so. I don't have any idea what his testimony would be because he refused to talk to me.

\* \* \* \* \* \*

Q: Are you telling me he was brought at your request from the Texas Department of Criminal Justice to Baylor County and you didn't know what he was going to say?

A: That's correct, because I had never talked to him and I didn't want to take the time to go down there to interview him.

\* \* \* \* \* \*

Q: [After handing an affidavit signed by Freddie Garcia (which is not in the record before this Court) to the district attorney] [D]o you disagree with those facts?

A: I do not disagree with the facts that he was incarcerated in the Baylor County jail on September 15th and 16th. With regard to his statement—With regard to this statement that he wanted to testify in the trial of David Ortega, I have no knowledge whether he wanted to or not. With regard to the testimony [sic] that the district attorney did not allow me to testify, I would disagree with that because I simply chose not to call him as a witness, and with regard to his testimony [sic] that I would have testified that David Ortega did not participate in the drug transaction of which he is accused, I obviously disagree with that.

■ This evidence does not show that the district attorney "knowingly withheld" exculpatory testimony. The district attorney had notified appellant's attorney that Garcia was a potential witness, and appellant knew that Garcia was present at the time of the disputed transaction. Moreover, there is no proof that the district attorney knew that Garcia wanted to testify for appellant. All the record shows is that Garcia was not cooperative and that he would not talk to the district attorney. The first point of error is overruled.

*Instruction on Good Time and Parole*

■ Appellant also argues that the trial court erred in failing to grant a new trial after appellant showed that the jury considered the effect of "good time and parole" in assessing the punishment. At the charge conference, appellant objected to the statuto-

ry instruction on good time and parole. See TEX.CODE CRIM.PRO.ANN. art. 37.07, § 4(b) (Vernon Supp.1993). In response to that objection, the trial court removed the statutorily required instruction. Appellant cannot complain of any error in the charge when he "invited the error."

Three jurors testified at the hearing on appellant's motion for new trial. Relevant portions of their testimony read as shown:

### Presiding Juror George Oustad

Q: What was the comment that you made first [on the subject of good time and parole]?

A: Well, we was—well, we started out to figure out what the sentence was and there was some all the way from ninety-nine years to fifty, so we knew we had to get somewhere in between, so that's where we just started talking about how many days was a years sentence and this and that was brought up.

\* \* \* \* \* \*

Q: And what number of days did y'all use?

A: Twenty-one to twenty-three, somewhere right in there.

\* \* \* \* \* \*

Q: And is that the way that y'all arrived at a sixty year sentence by calculating the actual time that would be served using that formula?

A: No.

Q: How did you arrive at that?

A: That was just brought up in the discussion, but as far as using that to figure out how many years, no.

\* \* \* \* \* \*

Q: Okay. So when you and the other jurors assessed a punishment of sixty years for Mr. Ortega, actually it was your understanding and the understanding of the other jurors that Mr. Ortega would only spend four of those years, is that right, in the penitentiary?

A: Yes.

### Cross–Examination

Q: [D]id you or anyone else make a representation to the other members of the jury as to what the law in this state was with regard to parole?

A: No, sir.

Q: Or good time?

A: No, sir.

### Juror Doris McNulty

Q: During your deliberation concerning the punishment, Mrs. McNulty, was there a discussion concerning good time and time off for good behavior and things like that?

A: Yes.

Q: And was there a discussion concerning parole also?

A: Yes.

\* \* \* \* \* \*

Q: And isn't it true that you figured— you took a sentence and you figured how long Mr. Ortega would actually spend by using that type of formula [21 days served for each year of sentence]?

A: That was strictly a guess.

Q: How do you mean it was a guess?

A: Well, according to the newspaper, TV and radio, this is, you know, common knowledge of what anybody would do, but it depends on how they behave.

\* \* \* \* \* \*

Q: And y'all figured that he would spend about twenty-one days for every year of the sentence, is that right?

A: If he behaved himself.

### Cross–Examination

Q: Mrs. McNulty, is it not true that this twenty-one days for one year was simply one factor in your deliberations? Didn't you consider other things besides the twenty-one days per year?

A: Yes.

Q: Didn't you in fact consider Mr. Ortega's previous criminal record [see Footnote 3]?

A: Right.

*Juror Diana Casillas*

Q: [I]sn't it true that the jury considered the fact that individuals are given good time or good time for good behavior and get off on parole early and so forth? Did you consider those factors in assessing punishment?

A: Well, we considered the fact that we thought he was guilty and that we wanted, you know, the drug trafficking off the street. I've got teenage children and I felt like after weighing the facts and everything, I felt like that he was guilty and that he should spend some time in prison.... You know, you'd have to be an idiot not to know that all people do not spend the full time in prison, and you know, you hear it on national TV. If you read the newspaper, any smart person would know that that person is not going to probably spend the full time in prison. I mean I thought about that.... [T]he judge didn't tell us not to consider I mean everything we know. He didn't tell us just go ahead and go there and forget everything you know about the law.

■ The Court of Criminal Appeals discussed this problem in the recent case of *Buentello v. State*, 826 S.W.2d 610 at 614 (Tex.Cr.App.1992), and held that the "five-prong" test of *Sneed v. State*, 670 S.W.2d 262 (Tex.Cr.App.1984):

[I]s still a viable means of determining whether a jury's discussion of parole law constitutes reversible error.

*Buentello* restated the test, supra at 611:

[I]n order to show reversible error based on a discussion of parole by a jury, the defendant must prove the existence of the following factors:

1) a misstatement of the law;

2) asserted as a fact;

3) by one professing to know the law;

4) which is relied upon by other jurors;

5) who for that reason changed their vote to a harsher punishment.

There is no showing that the jury's understanding of how good time and parole were calculated was a misstatement of the law; in fact, the jurors' understanding of the current operation of the good conduct and parole rules appears to be fairly accurate. None of the jurors professed to "know the law" on how the parole and good conduct rules are applied. The range of punishment before the discussion was 50 to 99 years, and after the discussion the jury agreed upon a sentence of 60 years. The record before us does not show jury misconduct which requires a new trial under the *Sneed* test as restated in *Buentello*. Appellant's second point of error is overruled.

The judgment of the trial court is affirmed.