NUMBER 13-02-165-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG








LEOPOLDO RODRIGUEZ MATA,                                                Appellant,



v.



THE STATE OF TEXAS,                                                                Appellee.








On appeal from the 275th District Court

of Hidalgo County, Texas.








MEMORANDUM OPINION






Before Justices Yañez, Castillo and Garza

Memorandum Opinion by Justice Castillo



          Appellant Leopoldo Rodriguez Mata ("Mata") was convicted by a jury of the
offense of murder and sentenced to ninety-nine years' confinement in the Texas
Department of Criminal Justice–Institutional Division.


 The indictment alleged that Mata
caused the death of Omar Munoz by stabbing him with a knife. The jury charge
included instructions on principal and party theories of criminal responsibility. In three
issues, Mata appeals his conviction by: (1) alleging ineffective assistance of counsel;
(2) challenging the factual sufficiency of the evidence to prove him guilty under the law
of parties; and (3) asserting that the jury, while properly charged on the issue of parole,
improperly considered how the parole law would apply to his specific situation. We
affirm.

I. BACKGROUND

          On December 31, 2000, in Pharr, Texas, Raymond Dean Sanchez met up with
his friend, Omar Munoz, at a mutual friend’s New Year’s Eve party in an apartment
complex. Sanchez testified that shortly after the new year rang in, Munoz asked
Sanchez to help him obtain some cocaine. In search of the drugs, Sanchez borrowed a
Dodge Ram truck from another friend and drove with Munoz to the apartment complex
where appellant Mata lived with his brother, Alejandro Rodriguez Mata ("Alex"), their
respective spouses, children, sister, and mother. Also present at the apartment were
Ernesto Lerma, former brother-in-law to the Mata brothers, and another man by the
name of Eddie, identified by Lerma as a friend. 

         Upon arrival at the Mata residence, both Sanchez and Munoz exited the vehicle
and approached the apartment, where they spoke to Mata. According to Sanchez’s
testimony, Mata stated that he could secure the drugs from his wife’s stepfather. 
Sanchez, Munoz, and Mata then boarded the Dodge Ram truck and traveled to the
home of the stepfather, where, upon arrival, Mata exited the vehicle to inquire about the
drugs. The stepfather then returned with Mata, and the two joined Sanchez and Munoz
in the truck, where they then traveled to yet another location to acquire the cocaine. 
When they reached the next location, Mata asked Munoz for the money and he and the
stepfather exited the vehicle while Sanchez and Munoz waited in the truck. The two
men returned with the cocaine, and Mata gave the drugs to Munoz. Sanchez further
testified that Munoz, Mata, and the stepfather all took “swiffs” of the cocaine, although
he did not actually see them taking it. Counsel for the State later clarified by her line of
questioning that Sanchez knew they had snorted the cocaine because he heard them
doing so. Sanchez dropped the stepfather off at his residence, and the three men
headed back toward the apartment complex. 

          On their way back, Sanchez testified, Munoz and Mata began arguing. 
Specifically, Munoz told Mata, “not to take a bath–not to rip him off with the stuff.” 
Sanchez clarified his testimony during cross examination, stating that the meaning of
the statement was “not to be vulgar,” and in effect meant, “don’t take too much of my
cocaine.” Mata replied that he “wasn’t like that” and the argument intensified. Upon
arrival at the complex, the two men became engaged in a physical altercation outside of
the vehicle in the parking lot. Sanchez testified that he went to the apartment to ask
Alex, Mata’s brother, to come and help him break up the fight. According to Sanchez’s
testimony, Alex “reacted in another manner,” taking out a screwdriver from his pocket
and running toward the scuffle, finally jumping on top of Munoz and proceeding to stab
him repeatedly with the screwdriver. Sanchez further testified that Mata continued to
strike Munoz while Alex was stabbing him, and that at one point, both of them were
stabbing Munoz. Sanchez testified that Alex yelled at Mata to go look for a knife that he
had in the apartment. As Mata started to leave to get the knife, Sanchez testified, Mata
tried to hit him as well, asking him why he brought “people like that” around. While
Mata went to get the knife, Alex continued stabbing Munoz all over his body with the
screwdriver. Sanchez also told the jury that, while Mata was gone, Alex attempted to
attack him as well. Sanchez’s testimony was unclear as to whether he left before or
after Mata returned; however, he did not see a knife in Mata's hand. At one point,
Sanchez stated that he could not say what happened after Mata returned because he
had left. However, further into his testimony, he stated that both Alex and Mata were
still hitting Munoz when he left the scene. 

          Ernesto Lerma, the former husband of Alicia Rodriguez, one of the Mata
brothers’ sisters, also testified before the jury. Lerma, who lived in San Marcos, Texas,
had traveled down to the Rio Grande Valley a few days prior to New Year’s Eve to visit
his parents. Lerma testified that he arrived at the Mata apartment shortly before
midnight on New Year’s Eve after taking his children to that area to purchase
firecrackers. Lerma also told the jury that Raymond Dean Sanchez arrived at the
residence at approximately 12:30 a.m. It was the first time he had ever seen Sanchez. 
According to Lerma, Sanchez and another man he did not know approached Mata and
the three men conversed “by the side.” The three men then left, and Lerma stayed
behind with Alex. When Mata, Sanchez, and the “other person” returned about thirty to
forty minutes later, Lerma testified, Sanchez exited the vehicle and took a few steps
toward the apartment. Lerma stated that Alex went to see what the problem was, and
“they started fighting.” He also said that it was difficult for him to say what happened
next because the altercation was occurring off in the distance and on the far side of the
truck, obstructing his view. Conflicting with Sanchez’s testimony, Lerma told the jury
that Mata did not return to the apartment, but that Alex did. He further testified that Alex
went into the apartment, got a knife, and returned to the area where the fight was taking
place. He further stated that Sanchez left in the truck at that time and added that
although the truck was no longer obstructing his view, it was still difficult to see because
it was “dark there in the ditch” where Alex and Mata were. When questioned regarding
the position of "the man he didn't know,” what he saw Alex doing with the knife, and
whether he saw someone kicking or hitting the man, Lerma stated that he could not see
because it was dark. After refreshing his memory with his written statement, Lerma
testified that Alex was “stabbing the guy,” who was “laying down in the ditch.” After
further review of his statement, Lerma also testified that Mata and “the person” were
fighting, and that Alex “separated them with the knife.” He further testified that Mata
kicked and punched the man on the ground while Alex was stabbing the man with a
knife. 

         Following the stabbing, Lerma testified, he told Alex and Mata that he was going
to go home and that he “didn’t want to be a part of this.” Alex and Mata wanted to go
with Lerma. He then got into his car, accompanied by his children, Alex, and Mata. 
Alex and Mata went inside the apartment before leaving, but Lerma did not. Lerma
drove to his parents’ home in Las Milpas, about 5 miles away from the apartment
complex. Upon arrival at the home of Lerma's parents, Alex went home on foot and
Mata asked Lerma to take him to his cousin’s house, which Lerma did. Lerma then
went to sleep. The next day, Lerma returned to San Marcos with Alicia, his children,
and Mata, who wanted to go with them. Lerma stated that he did not want Mata to go
with them to San Marcos “because he got in trouble,” but he did not express his
concern to Mata. He allowed Mata to join them. After approximately a four-hour drive to
San Marcos, he drove to a house where he dropped off Alicia, the children, and Mata. 
He then went to his own brother’s house, and he did not see Mata again after that. 

          The following day, Lerma received a message on his answering machine from
Investigator Gilbert Guerrero, asking that Lerma give a statement. Lerma returned to
the valley on or about January 21, 2001, and complied with the request. Lerma further
testified that there was another person present outside the apartment at the time of the
occurrence–a man named “Eddie.” According to Lerma, he believed that Eddie was in
jail and was therefore unable to testify. Lerma also testified that nobody tried to stop
Alex from returning to the parking lot with a knife because “nobody wanted to get
involved,” but then testified that Alicia and Adriana tried to stop Alex, following him and
yelling at him, but to no avail. 

          During cross-examination, Lerma testified that (1) he never heard Mata
encourage Alex to get the knife, (2) he never heard Mata solicit Alex for help in getting
the knife, (3) he did not hear Mata telling Alex to stab Munoz, and (4) he did not see
Mata assisting Alex with the stabbing. Lerma also told the jury that, although his
statement indicated that he saw Mata punching the victim, he actually could not say
whether or not he saw Mata striking Munoz because of the distance between himself
and the altercation. Lerma further stated that Investigator Guerrero threatened to have
him arrested, that he feared he was going to be arrested because he had taken Mata to
San Marcos, and that Guerrero did not read him his Miranda warnings. In addition,
Lerma claimed that he told Guerrero “whatever he wanted to hear to avoid being
arrested,” and that Guerrero was “helping him” with the facts. 

          During redirect examination, Lerma stated that he lied when he told the jury he
saw Mata punching Munoz. He testified a while later that he did tell Officer Guerrero
about Mata punching and kicking the victim. Lerma then read out a portion of his
written statement that he claimed were Guerrero’s words–not his own: “This guy was
laying in the ditch when I saw Alex attack. I saw Alex attacking this guy with a knife. 
Alex started stabbing him several times, and he was still fighting with this guy. Mata
was punching this guy while Alex was stabbing him with a knife.” The jury also heard
that Guerrero never arrested or handcuffed Lerma. 

          Vanessa Quintanilla, Alex’s wife and Mata’s sister-in-law, was inside the
apartment when the altercation began. According to her testimony, Dean Sanchez
stopped in the road and "yelled for them to watch out." After refreshing her memory
with her written statement, Quintanilla recounted to the jury that she saw Alex run after
Sanchez from her window. She then went to the kitchen, stood by the stove, and then
returned to her room because she did not see anything “going on.” When she returned
to the kitchen, she saw Alex, who could barely walk, limping out the door. The jury
heard that Adriana Mata, sister to Mata and Alex, attempted to stop Alex from leaving
by holding him by the shirt. Quintanilla followed after Alex, only going as far as her
mother-in-law’s vehicle. She testified that she was unable to see what was occurring in
the distance, as the street light was shining on her. She also testified that she did not
recall seeing Mata come inside the apartment and did not remember if Mata was
present during the incident that occurred outside the apartment. When asked again to
refresh her memory with her statement, Quintanilla indicated that she did not say some
of the words included in the statement. 

          During her testimony, Quintanilla read aloud the following portion that she
claimed not to have said: “That’s where I saw the guy lying in the ground, and Alex was
on top of him. I saw Mata on top of the guy. Mata was kicking the guy. I saw Alex kick,
stabbing the guy with a knife on the side, and then I saw Alex get on top from–get up
from on top of the guy.” Quintanilla told the jury that she left the apartment, returned the
next morning, and saw the body on the ground. During direct examination, the jury
heard additional testimony from Quintanilla regarding her written statement. According
to Quintanilla, she was nervous and afraid because Officer Guerrero threatened to
arrest her, her brother, and her sister-in-law. She further testified that she was
seventeen years old, that this was her first time giving a statement, and that she was
not given the opportunity to read the statement before signing it. She told the jury that
she was not able to review the statement until the prosecuting attorney visited her
home, some two weeks before her testimony at trial. At that time, Quintanilla testified,
she indicated to the prosecutor that a portion of the statement was not hers. She was
not given an opportunity to write a different statement. Quintanilla also added to her
prior testimony regarding Alex’s leg injury by stating that he had blood on his knee and
appeared to be cut. Quintanilla added that (1) she did not see Alex fighting with
anyone, (2) she did not see Mata fighting with anyone, (3) she did not see Mata
stabbing anyone, (4) she did not see Mata encouraging Alex to stab anyone, (5) she did
not see Mata assisting the stabbing, (6) she did not see Mata promoting the stabbing,
(7) she did not see Mata solicit Alex to stab anyone, (8) she did not see Mata direct the
stabbing of anyone, and (9) she did not see Mata holding anybody while Alex stabbed
him. When asked if she was saying that she did not see what happened that night, she
replied, “No. Where they were, there was no light.” 

          Adriana Mata, sister to the Mata brothers, testified that she too was present and
with her family at the apartment on the night of the incident. In her statement to the
police, she stated she saw Alex take a knife from the kitchen drawer and walk out. She
saw Alex stab a man who was on the ground and saw Mata punching and kicking the
man. At trial, she testified that she saw Alex and Mata enter the apartment. According
to Adriana, Alex was bleeding from his knee and was “mad,” screaming that nobody
was going to mess with his family. She did not remember what Alex did at that point. 
Mata had a cut somewhere on his arm. When asked if Alex got something out of the
kitchen, she replied, “I don’t remember, no.” When asked if Alex stayed in the
apartment after that, she answered, “No, I don’t remember.” In response to the
question, “Do you remember did he leave the apartment,” she said “I guess.” When
asked if Mata left with him, her reply was “I don’t remember. Maybe. I don’t know.” 
Regarding her written statement to the police, Adriana testified that she did not read the
statement before signing it but most of it was correct. She admitted stating that she
had grabbed both of her brothers by their shirts when they were in the apartment, but
that they were stronger than her, so they slipped. When asked to read aloud the
portion of her statement that she claimed not to have said, Adriana denied stating to the
police that she saw Alex stab Munoz and Mata strike him. Adriana then confirmed the
that (1) Mata never asked Alex to go do anything, (2) Mata never encouraged Alex to go
do anything, and (3) Mata never directed Alex to do anything. She also testified that
Investigator Guerrero and some other police officers came to her cousin George’s
house and arrested her mother the day after Adriana gave her statement. They
threatened, she testified, to hold her mother “until her sons did something.” 

          Kevin Jordan, an investigator with the Guadalupe County Sheriff’s Department,
received a warrant for the arrest of Mata. When executing the warrant, Mata blurted
out that it was not his fault and began to tell Jordan what happened. Jordan stopped
him, advised him of his Miranda rights, and had him transported to the sheriff’s office by
the patrol officer. Upon arrival at the sheriff’s office, Mata was magistrated before the
Justice of the Peace. Following the arraignment, Jordan testified, he asked Mata if he
was willing to give a statement, to which Mata indicated "yes." Jordan then advised
Mata of his rights, which were waived, and proceeded to take the statement. Jordan
read the statement aloud in its entirety to the jury. 

          In his written statement admitted in evidence, Mata asserted that at around
midnight on January 1, 2001, when Sanchez, Munoz, Martinez and he returned to the
apartment, Munoz cussed at him and accused him of being a narc. As Mata exited the
truck, Munoz, while "real drunk," pushed him to the ground and kicked him on his
stomach and back. Then, according to Mata, Sanchez cut Mata's left elbow with a
knife. Mata then ran around the truck to get away from Sanchez and Munoz. 
According to the statement, Alex saw what was going on and told Mata to get in the
house. Mata saw Alex grab Sanchez by the shirt and throw him to the ground and saw
Munoz punch Alex and stab him in the knee. Sanchez and Munoz ran to the truck but
Sanchez pushed Munoz back and left him behind. Alex and Munoz fought; Munoz was
knocked out. Alex entered the house and got a kitchen knife from the sink. Alex was
mad because of the stab wound to his knee. Mata told him to leave Munoz alone. Alex
got on top of Munoz, who was still knocked out, and stabbed him in the stomach with
the knife. Mata tried to pull Alex off Munoz but Alex, out of control, told him to leave. 
Mata left the area, ending up in San Marcos. Mata finished his statement with: "I want
to say that I did get into a fight with Dean and [Munoz] but only after [he] hit and kicked
me. I only pushed [Munoz] in self defense. Even after Dean stabbed me, I only pushed
him to get away. At no time did I ever have a knife nor did I stab anyone." 

          Julian Zapata, an identification supervisor with the City of Pharr Police
Department, testified that he attended and photographed the autopsy of the victim. He
saw stab wounds on the victim’s stomach and chest as well as both stab and puncture
wounds on the victim’s back. He also observed what appeared to be additional stab
wounds on each of the victim’s arms. 

          Dr. Flugencio Salinas performed the autopsy on the body of Omar Munoz. He
testified that some bruising noted on the forehead of the victim could have occurred as
a result of blunt trauma. He also noted three major stab wounds–one that punctured
the lung, one that penetrated the abdominal cavity, and one that penetrated the heart,
any one of which could have killed the victim. Dr. Salinas testified that all three of the
major wounds were consistent with knife-inflicted wounds. Regarding some smaller
stab wounds on the victim’s back, Dr. Salinas opined that they may have been caused
by a screwdriver. He counted a total of twelve stab wounds on the victim. He also
stated that toxicology testing showed the presence of both cocaine and alcohol in the
victim’s system. 

          Orlando Ochoa, forensic seriologist and DNA analyst for the Texas Department
of Public Safety Crime Laboratory in McAllen, Texas, performed DNA testing on various
items collected at the scene. In examining a knife blade, Ochoa discovered an
apparent piece of tissue in one of the serrated areas of the blade. He performed DNA
tests of the tissue, which showed the tissue to be consistent with Alex's. None of the
DNA testing done on of the items came back with a match for Mata. 

II. FACTUAL SUFFICIENCY OF THE EVIDENCE

          In his second issue, Mata asserts that the evidence was factually insufficient to
show that he aided or assisted Alex, the principal and actual individual who stabbed and
killed Munoz. Mata asserts that mere presence at the scene is not enough; the
evidence must show that he encouraged the commission of the offense by an
agreement or words, and that the agreement must have occurred before or
contemporaneous with the criminal event. Further, Mata states, the evidence must
show that the parties were acting together, each contributing some part toward the
execution of their common purpose. Mata maintains that an accused may not be held
accountable as a party without some indication that he knew he was assisting in the
commission of the offense. Mata argues that the State must prove that the accused
harbored the specific intent to promote or assist the commission of the offense. Mata
concedes that, in determining whether an accused acted as a party, the fact finder may
examine events occurring before, during, and after commission of the offense. The
State counters that the evidence shows that a finding of guilt under a party theory is
supported by the great weight of the evidence.

A. Standard of Review 

           We are constitutionally empowered to review the judgment of the trial court to
determine the factual sufficiency of the evidence used to establish the elements of the
offense with which Mata was charged. See Johnson v. State, 23 S.W.3d 1, 7 (Tex.
Crim. App. 2000) (en banc). The Texas Court of Criminal Appeals has restated the
factual sufficiency standard of review:

There is only one question to be answered in a factual sufficiency review:
Considering all of the evidence in a neutral light, was a jury rationally
justified in finding guilt beyond a reasonable doubt? However, there are
two ways in which the evidence may be insufficient. First, when
considered by itself, evidence supporting the verdict may be too weak to
support the finding of guilt beyond a reasonable doubt. Second, there
may be both evidence supporting the verdict and evidence contrary to the
verdict. Weighing all the evidence under this balancing scale, the contrary
evidence may be strong enough that the beyond-a-reasonable-doubt
standard could not have been met, so the guilty verdict should not stand.
This standard acknowledges that evidence of guilt can 'preponderate' in
favor of conviction but still be insufficient to prove the elements of the
crime beyond a reasonable doubt. Stated another way, evidence
supporting guilt can 'outweigh' the contrary proof and still be factually
insufficient under a beyond-a-reasonable-doubt standard. 



Zuniga v. State, 144 S.W.3d 477, 484-85 (Tex. Crim. App. 2004). A clearly wrong and
unjust verdict occurs where the jury's finding is "manifestly unjust," "shocks the
conscience," or "clearly demonstrates bias." Prible v. State, No. AP-74,487, 2005 Tex.
Crim. App. LEXIS 110, at *16-*17 (Tex. Crim. App. January 26, 2005) (designated for
publication). 

          When the State bears the burden of proof, the proof of guilt is factually
insufficient if it is so obviously weak as to indicate that a manifest injustice has occurred
or if it is greatly outweighed by contrary proof. Zuliani v. State, 97 S.W.3d 589, 593-94
(Tex. Crim. App. 2003). In determining the factual sufficiency of the elements of the
offense, we view all the evidence neutrally, not through the prism of “the light most
favorable to the prosecution.” Johnson, 23 S.W.3d. at 6-7, (citing Clewis v. State,
922 S.W.2d 126, 129 (Tex. Crim. App. 1996)). In conducting a factual-sufficiency
review, we review the evidence weighed by the jury that tends to prove a material
disputed fact and compare it with evidence that tends to disprove it. Id. We are
authorized to disagree with the fact finder's determination. Id. However, we approach
a factual sufficiency review with appropriate deference to avoid substituting our
judgment for that of the fact finder. Id. Our evaluation should not intrude substantially
on the fact finder's role as the sole judge of the weight and credibility given to witness
testimony. Id. 

          We always remain aware of the fact finder’s role and unique position, a position
we are unable to occupy. Id. at 9. Exercise of our authority to disagree with the fact
finder’s determination is appropriate only when the record clearly indicates our
intervention is necessary to stop manifest injustice. Id. Otherwise, we accord due
deference to the fact finder’s determinations, particularly those concerning the weight
and credibility of the evidence. Id. Absent exceptional circumstances, issues of
witness credibility are for the jury, and we may not substitute our view of the credibility
of a witness for the constitutionally guaranteed jury determination. Id. 

          Every fact need not point directly and independently to the accused’s guilt. 
Vanderbilt v. State, 629 S.W.2d 709, 716 (Tex. Crim. App. 1981). A conclusion of guilt
can rest on the combined and cumulative force of all the incriminating circumstances.
Id. We reverse a judgment of conviction only if proof of guilt is so obviously weak and
manifestly unjust or the contrary evidence is so strong that the standard of proof
beyond a reasonable doubt could not have been met. Prible, 2005 Tex. Crim. App.
LEXIS 110, at *17. If we reverse a criminal case for factual insufficiency, we vacate
the judgment of conviction. Clewis, 922 S.W.2d at 133-34. We remand for a new trial
a criminal case reversed for factual insufficiency so a second jury has the chance to
evaluate the evidence. Swearingen v. State, 101 S.W.3d 89, 97 (Tex. Crim. App. 2003)
(en banc). 

          In conducting a factual sufficiency review, we review all the evidence. Cain v.
State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). In the opinion, we “show our work”
when we consider and address the appellant’s main argument for urging insufficiency of
the evidence. Tex. R. App. P. 47.1; Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App.
2003) ("A proper factual sufficiency review must include a discussion of the most
important and relevant evidence that supports the appellant's complaint on appeal."). 
This practice benefits the parties, maintains the integrity of the justice system, and
improves appellate practice. Id.  

B. General Verdict

          When the indictment alleges alternate theories of committing the same offense,
it is proper for the jury to be charged in the disjunctive and to return a general verdict of
guilty. Kitchens v. State, 823 S.W.2d 256, 258 (Tex. Crim. App.1991) (en banc); See
Tex. Code Crim. Proc. Ann. art. 37.07, § 1(a) (Vernon Supp. 2004-05) (verdict must be
general). The conviction will be upheld if the evidence is sufficient to support a finding
of guilt under any one of the theories submitted. Kitchens, 823 S.W.2d at 258; see
Aguirre v. State, 732 S.W.2d 320, 326 (Tex. Crim. App. 1987); Yandell v. State, 46
S.W.3d 357, 363 (Tex. App.–Austin 2001, pet. ref'd).

           C. The Law Applicable to the Sufficiency Analysis for Murder

1. The Hypothetically Correct Charge

          A hypothetically correct charge is one that accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State’s burden of
proof or restrict its theories of liability, and adequately describes the particular offense
proof. Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Cano v. State, 3
S.W.3d 99, 105 (Tex. App.–Corpus Christi 1999, pet. ref'd). A hypothetically correct
jury charge would not simply quote from the controlling statute. Gollihar v. State, 46
S.W.3d 243, 254 (Tex. Crim. App. 2001). Its scope is limited by the statutory elements
of the offense as modified by the charging instrument. See Fuller v. State, 73 S.W.3d
250, 254 (Tex. Crim. App. 2002) (Keller, P.J., concurring) (quoting Curry v. State, 30
S.W.3d 394, 404 (Tex. Crim. App. 2000)). Malik flatly rejects use of the jury charge
actually given as a means of measuring sufficiency of the evidence. See Gollihar, 46
S.W.3d at 252. Malik controls sufficiency of the evidence analysis even in the absence
of alleged jury charge error.


 Id. at 255. Here, with sufficient evidence of Mata's
participation in the planning and commission of Munoz's murder, the indictment
supported a jury instruction on the law of parties without a parties allegation in the
indictment.


 See Goff v. State, 931 S.W.2d 537, 544 n.5 (Tex. Crim. App. 1996) (en
banc). 

          In determining whether an accused participated as a party in an offense, a fact
finder may examine the events occurring before, during, and after the commission of
the offense and rely on actions of the accused that show an understanding and
common design to commit the offense. Hanson v. State, 55 S.W.3d 681, 690 (Tex.
App.–Austin 2001, pet. ref’d). Thus, conviction was authorized under the evidence in
this case if a rational jury could find that Mata intentionally caused Munoz's death,
either as a principal or as a party. See Tex. Pen. Code Ann. § 19.02(b)(1) (Vernon
2003); see also Hanson, 55 S.W.3d at 690. A person commits murder if he
intentionally or knowingly causes the death of an individual. Tex. Pen. Code Ann. §
19.02(b)(1) (Vernon 2003). A person is criminally responsible as a party to an offense if
the offense is committed by his own conduct, by the conduct of another for which he is
criminally responsible, or by both. Id. § 7.01 (Vernon 2003). A person is criminally
responsible for an offense committed by another if, with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense. Id. § 7.02(a)(2) (Vernon 2003).

          Mata was charged under the law of parties. Accordingly, the jury could convict
him if it found that he was "present at the commission of the offense and encourage[d]
its commission by words or other agreement." King v. State, 29 S.W.3d 556, 564 (Tex.
Crim. App. 2000) (en banc). Thus, evidence is sufficient to convict under the law of
parties where the defendant is physically present at the commission of the offense and
encourages its commission by words or other agreement. Ransom v. State, 920
S.W.2d 288, 302 (Tex. Crim. App. 1994) (en banc). 

D. Inferences of Guilt

          In addition to the court's charge, we note that mental states may be inferred and
proven from acts done, words spoken, and the surrounding circumstances. See
Ledesma v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (en banc). Intent, in
particular, is often shown by acts done, words spoken, and conduct of the accused at
the time of the offense. See Dues v. State, 634 S.W.2d 304, 305 (Tex. Crim. App.
1982) (panel opinion). Evidence of flight is admissible as a circumstance from which a
jury may draw an inference of guilt. Bigby v. State, 892 S.W.2d 864, 883 (Tex. Crim.
App. 1994) (en banc). As is almost always the case, intent must be established by
circumstantial evidence. See Dillon v. State, 574 S.W.2d 92, 94 (Tex. Crim. App.
1978). The jury may infer the requisite intent from the conduct of the accused. See
Conner v. State, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). 

E. Sufficiency Analysis 

          Mata asserts that the evidence is factually insufficient to prove that he was a
party to the offense. Mata argues that the evidence shows that he participated only by
kicking and punching Munoz. He argues that the evidence does not establish that he in
any way solicited, encouraged, directed, aided his brother, or was an active participant
in stabbing Munoz to death. He adds that there is no evidence, direct or circumstantial,
to show that Alex and he had an agreement or plan to kill Munoz. The State counters
that Mata was responsible for the murder of Munoz as either a principal or a party. The
State points out that on appeal, Mata challenges only the factual sufficiency of the
evidence under the law of parties and, thus, the evidence supports Mata's conviction as
a principal. 

         The State presented evidence on both principal and party theories. The jury
charge contained an instruction on both theories. Thus, the charge authorized the jury
to find Mata guilty if he acted either as a party or as a principal to the offense. The jury
rendered a general verdict of guilty. Because Mata has chosen not to challenge the
sufficiency of the evidence on the principal theory, he has waived any argument he
might have had on appeal. See Tex. R. App. P. 38.1 (e), (h) (brief must state concisely
all issues presented for review, must contain clear and concise argument for
contentions made, with appropriate citations to authorities and record, respectively). 
Thus, if evidence of guilt is sufficient, we will affirm the verdict based on the State's
principal theory. See Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992)
(en banc); Edwards v. State, 106 S.W.3d 833, 839 (Tex. App.–Dallas 2003, pet. ref'd)
(if evidence of guilt is sufficient either as principal or as party, appellate court must
affirm jury's verdict); see also Kitchens, 823 S.W.2d at 259.

          Mata contends the evidence is factually insufficient for a rational juror to find he
was a party to the murder. Mata challenges only the sufficiency of the evidence as to
the State's party theory. The evidence shows that, while traveling together in the truck
after purchasing cocaine, Mata and Munoz argued. The argument intensified. The two
fought once they arrived at the apartment complex and exited the vehicle. Sanchez
went to ask Alex, who was in the apartment, to help break up the fight. Alex used a
screwdriver from his pocket to stab Munoz. While Alex stabbed Munoz, Mata continued
to strike him. Sanchez, at one point, saw both Mata and Alex stab Munoz. Sanchez
heard Alex yell to Mata to go look for a knife in the apartment. As Mata walked by
Sanchez on his way to the apartment, Mata tried to hit Sanchez, asking him why he
brought "people like that" around. 

          The record shows evidence that conflicts with Sanchez's testimony. Lerma
testified that he saw Alex retrieve a knife from the apartment and return to the fight. 
Lerma testified that Mata kicked and punched Munoz, who was on the ground, while
Alex stabbed Munoz with a knife. Lerma testified that he did not hear Mata encourage
Alex to get the knife. He did not hear Mata ask Alex for help in getting the knife. He
also did not hear Mata tell Alex to stab Munoz. He did not see Mata stab Munoz. 

          Mata's sister-in-law testified that she saw Alex inside the apartment and could
not really see what was occurring outside. In her statement to the police, she stated
she saw Munoz on the ground, Alex on top of him, and Mata kicking him. 

          Mata's sister testified that she saw Mata and Alex in the apartment, both with
cuts, but that she did not see an altercation outside. In her statement to the police, she
indicated that she saw both her brothers inflicting injury on Munoz while he was on the
ground. In his statement to law enforcement read to the jury, Mata admitted he fought
with Munoz but claimed self-defense. 

          The evidence establishes that, on January 1, 2001, eye witnesses saw Mata
punch and kick Munoz, while Alex stabbed him. One eyewitness saw both men at one
point stabbing Munoz. Munoz sustained stab wounds to the front and back of his body,
consistent with injuries from a knife and a screwdriver. One eyewitness saw Alex
remove a screwdriver from his pocket and stab Munoz. The same eyewitness heard
Alex yell to Mata to get a knife from the kitchen drawer. On his way to comply, Mata
attempted to strike the eyewitness. As the eyewitness left the scene shortly after that
encounter with Mata, he saw Alex and Mata hitting Munoz. Alex and Mata left the
scene. Mata fled to San Marcos. 

          The jury was free to place whatever value it wished on Mata's statement. See
Wesbrook v. State, 29 S.W.3d 103, 112 (Tex. 2000) (en banc). The State presented
testimony throughout the trial of witnesses who recalled the key events that occurred on
January 1, 2001. The jury was free to reconcile any discrepancies in the testimony
before it and judge the credibility of the witnesses. Id. at 111. Moreover, the jury was
free to disbelieve Mata's statement to police that he fought with Munoz in self-defense. 
We find that the jury could have inferred that Mata's actions before, during, and after
Munoz's murder showed an understanding of the offense as a party. See Hanson, 55
S.W.3d at 690.

          Having reviewed all the evidence in a neutral light with appropriate deference to
the jury's credibility determinations, we conclude that the evidence demonstrates that a
rational trier of fact could have found beyond a reasonable doubt that Mata participated
in this offense as a party. King, 29 S.W.3d at 564; Ransom, 920 S.W.2d at 288. The
evidence showed that Mata joined his brother in inflicting injury to Munoz as Munoz was
on the ground. That the evidence of guilt was not free of contradiction and that the
credibility of witnesses may have been subject to question does not require us to
conclude that the verdict was factually insupportable. See Zuliani, 97 S.W.3d at
593-94. Those circumstances merely create issues for the jury to resolve. Id. Faced
with a record of historical facts that supports conflicting inferences, we presume that the
trier of fact resolved any conflicts in favor of the prosecution. See Jackson, 443 U.S. at
326. The jury chose to resolve the evidence in favor of the prosecution. We defer to
that resolution. Id. 

          We conclude that the evidence supporting the verdict is not too weak to support
the jury's finding of Mata's participation as a party nor is the weight of the evidence
contrary to the verdict strong enough that the State could not have met its burden of
proof. See Zuniga, 144 S.W.3d at 484-85. We conclude the evidence was factually
sufficient to support the conviction. Id. We further conclude, although unnecessary to
our analysis, that the same evidence is factually sufficient to show Mata participated as
a principal. Id.; see Tex. Pen. Code Ann. § 7.02(a)(2) (Vernon 2003); see also
Rabbani, 847 S.W.2d at 558; Edwards, 106 S.W.3d at 839; Kitchens, 823 S.W.2d at
259.

           We overrule Mata's second issue.

IV. EFFECTIVE ASSISTANCE OF COUNSEL

          In his first issue, Mata asserts that his conviction should be reversed because he
was denied effective assistance of counsel. In particular, Mata states that his trial
counsel was ineffective because he failed to urge a motion to suppress Mata's
statement. Mata maintains this motion should have been urged on the basis that his
arrest was illegal and because his counsel failed to adduce facts at trial that would
entitle Mata to an instruction of unconstitutional arrest. Mata asserts that the record
does not support a finding of trial strategy. The State responds that trial counsel was
vigilant at trial, lodged appropriate objections, and vigorously cross-examined
witnesses. The State adds that both complaints are unsupported in law or in fact.

          A claim of ineffective assistance of counsel must be firmly supported in
the record. McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996) (per
curiam) (en banc). When determining the validity of a defendant's claim of ineffective
assistance of counsel, we must be highly deferential to trial counsel and avoid the
distorting effects of hindsight. Ingham v. State, 679 S.W.2d 503, 509 (Tex. Crim. App.
1984) (en banc). We presume counsel's performance was the result of sound or
reasonable trial strategy. Strickland v. Washington, 466 U.S. 668, 688 (1984); see also
Stafford v. State, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991) (en banc). We will not
base a finding of ineffectiveness on speculation. See Jackson v. State, 877 S.W.2d
768, 771 (Tex. Crim. App. 1994) (per curiam); Gamble v. State, 916 S.W.2d 92, 93
(Tex. App.–Houston [1st Dist.] 1996, no pet.). Mata has not rebutted the presumption
he was adequately represented. See Strickland, 466 U.S. at 688. 

          For example, regardless of whether counsel's failure to adduce evidence to allow
a request for a jury instruction on unconstitutional arrest was deficient performance,
Mata has not proved to a reasonable probability that, but for counsel's failure to adduce
evidence and request the instruction, the result of the proceeding would have been
different. See Strickland, 466 U.S. at 698. 

          At trial, the Guadulupe County Sheriff's Department investigator, Kevin Jordan,
testified that he was contacted by Investigator Guerrero on January 2, 2001, at
approximately 9:00 a.m. According to Jordan, Guerrero was asking for assistance, so
Jordan requested that Guerrero provide him with a description of the suspect and fax
him a copy of the arrest warrant. About forty-five minutes later, Jordan received the
copy of the warrant and the confirmation of the warrant for the arrest of Mata. Jordan
testified that he was told the suspect was armed and dangerous. He gathered a group
of officers and headed to an address on Spruce Street in northern Guadalupe County. 
Upon arrival, the group discovered that Mata was not present. Jordan left a card with a
resident and asked her to call him if Mata showed up. Shortly after noon, Jordan
received a phone call from the resident, and he, along with an additional investigator
and a patrol Sergeant, traveled back to the residence. When he encountered Mata, he
identified himself and advised Mata that he was under arrest. At that point, Jordan
testified, Mata blurted out that it was not his fault and began to tell Jordan what
happened. Jordan stopped him, advised him of his Miranda rights


, and had him
transported to the sheriff’s office by the patrol officer. Upon arrival at the sheriff’s office,
Mata was magistrated before the Justice of the Peace. Following the arraignment,
Jordan testified, he asked Mata if he was willing to give a statement, to which Mata
indicated "yes." Jordan then advised Mata of his rights, which were waived, and
proceeded to take the statement. Jordan read the statement aloud in its entirety to the
jury. During cross examination, Jordan stated that Mata was not armed at the time of
the arrest, and that he voluntarily surrendered. 

          The events leading up to Mata's arrest while in San Marcos were developed.
Even so, Mata failed to demonstrate prejudice from the alleged deficiency and failed to
prove ineffective assistance of counsel. See Rangel v. State, 972 S.W.2d 827, 835
(Tex. App.–Corpus Christi 1998, pet. ref'd). 

          When the record is silent regarding the motivation of counsel's tactical decisions,
the defendant cannot overcome the strong presumption that counsel acted reasonably. 
Mallett v. State, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001). In most cases, the record on
direct appeal is insufficient to review claims of ineffective assistance of counsel. See 
Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); Ortiz v. State, 93
S.W.3d 79, 88-89 (Tex. Crim. App. 2002) ("If counsel's reasons for his conduct do not
appear in the record and there is at least the possibility that the conduct could have
been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an
ineffective assistance claim on direct appeal."). 

          Thus, on this record, we conclude that Mata has failed to establish that his trial
counsel was ineffective. Without a record of trial counsel's overall performance and
strategic decisions, we cannot determine if counsel's performance was objectively
deficient or if it created an unnecessarily disadvantageous result.


 See Jackson, 877
S.W.2d at 771. We overrule Mata's first issue. 

  V. JURY MISCONDUCT

          In his third issue, Mata asserts that the jury, while properly charged on the issue
of parole, nonetheless considered how the parole law would specifically apply to Mata's
case. Mata states that, while the law permits the jury to discuss and consider the
existence of parole law, in generic form, it is clearly impermissible to attempt to apply
the parole law to the particular defendant on trial or to consider the possibility of parole
in arriving at or calculating a specific sentence which directly applies to the particular
defendant on trial. Mata also asserts that the jury failed to follow the parole instruction.


 
The State counters that Mata waived error, and, even if he had not waived error, the
trial court did not abuse its discretion in failing to grant a new trial because doing so
would have constituted an improper inquiry into the validity of the verdict in violation of
Texas Rule of Evidence 606(b).

A. Motion for New Trial

          We construe Mata's issue broadly, as we must. Tex. R. App. P. 38.1(e), 38.9. 
Mata filed a motion for new trial alleging jury misconduct during the culpability phase of
deliberations by discussing appropriate punishment if the jury found Mata guilty and
during the punishment phase by discussing and attempting to calculate the time Mata
would be incarcerated before being released on parole. Two jurors' affidavits are in the
clerk's record bearing a filing date of February 6, 2002. The record does not establish
that the trial court considered the affidavits at the motion for new trial hearing or that
they were admitted in evidence.


 

          In the affidavits, the jurors attest that in assessing the ninety-nine year sentence,
the jury considered parole and "calculated the parole" and, essentially, except for the
discussions, they would not have voted for the ninety-nine year sentence.


 An order
setting a hearing on the motion appears in the record. A docket entry shows that the
hearing was reset and called for hearing on February 7, 2002. After arguments made
by both sides, the trial court denied the motion for new trial. The record on appeal 
contains neither an order denying the motion for new trial nor a reporter's record of a
hearing on the motion for new trial. 

          Rule 21.2 of the Texas Rules of Appellate Procedure states that a motion for
new trial is a prerequisite to presenting a point of error on appeal only when necessary
to adduce facts not in the record. We have no reporter's record of the motion for new
trial hearing. However, the Court may receive evidence by affidavit or otherwise. Tex.
R. App. P. 21.7. The granting of a motion for new trial must be accomplished by written
order. Tex. R. App. P. 21.8(b). A docket entry does not constitute a written order. Id. 
A docket entry may not substitute for a written order as a means to dispose of a motion
for new trial. State v. Garza, 931 S.W.2d 560, 562 (Tex. Crim. App.1996) (en banc); 
State v. Zavala, 28 S.W.3d 658, 659 (Tex. App.–Corpus Christi 2000, pet. ref'd). A
docket sheet entry does not become part of the record because it is inherently
unreliable. State v. Shaw, 4 S.W.3d 875, 878 (Tex. App.–Dallas 1999, no pet.). A
motion not timely ruled on by written order will be deemed denied within seventy-five
days after imposing or suspending sentence in open court. Tex. R. App. P. 21.8(c).
Because no order disposing of the motion for new trial appears in the record, we
conclude that the motion was overruled by operation of law. Id. We turn now to the
merits of Mata's complaint.

B. Scope and Standard of Review

          An appellate court reviews a trial court's denial of a motion for new trial under the
"abuse of discretion" standard. Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App.
2004). We do not substitute our judgment for that of the trial court, but rather we
decide whether the trial court's decision was arbitrary or unreasonable. Id. We must
view the evidence in the light most favorable to the trial court's ruling and presume that
all reasonable factual findings that could have been made against the losing party were
made against that losing party. Id. Thus, a trial court abuses its discretion in denying a
motion for new trial only when no reasonable view of the record could support the trial
court's ruling. Id. We must defer to any reasonable implied factual findings that the trial
court might have made in denying a motion for new trial. See id. at 211. In the context
of the denial of a motion for new trial, "[a] deferential rather than de novo standard
applies to our review of a trial court's determination of historical facts when that
determination is based, as here, solely upon affidavits" regardless of whether the
affidavits are controverted. Id. at 210.

          The person who composes the affidavits must ensure that they contain sufficient
specific concrete facts that are free from any ambiguity, uncertainty, or inconsistency as
to clearly establish entitlement to relief. Id. at 213. Even so, the trial judge is not
required to believe those factual statements, even when they are uncontradicted by
other affidavits. See id. Just as a jury may "believe all, some, or none of the
testimony," so may a trial judge believe all, some, or none of an affidavit, even though it
may be difficult (if not impossible) to assess an affiant's credibility solely from the cold,
hard page. Id. 

C. The Law

          The defendant must be granted a new trial when, after retiring to deliberate, the
jury has received other evidence, when a juror has talked with anyone about the case,
or when a juror became so intoxicated that his or her vote was probably influenced as a
result. Tex. R. App. P. 21.3(f). The defendant must be granted a new trial when the
jury has engaged in such misconduct that the defendant did not receive a fair and
impartial trial. Tex. R. App. P. 21.3(g). Rule 606(b) of the Texas Rules of Evidence
limits the method by which a defendant may prove jury misconduct. Hines v. State, 3
S.W.3d 618, 621 (Tex. App.–Texarkana 1999, pet. ref'd.). Rule 606(b) provides that
upon an inquiry into the validity of a jury's verdict, a juror may not testify as to any
matter or statement occurring during the jury's deliberations or to the effect of anything
on any juror's mind or emotions or mental processes as influencing any juror's assent to
or dissent from the jury's verdict. Tex. R. Evid. 606(b).


 The rule further provides that
a juror's affidavit concerning such matters may not be admitted in evidence for any of
those purposes. Id. The rule does provide that a juror may testify as to whether any
outside influence was improperly brought to bear upon any juror. Id.  

          A motion for new trial based on jury misconduct must be supported by a juror's
affidavit alleging that "outside influences" affected the jury's decision. Hines, 3 S.W.3d
at 623. While case law has not clearly identified what constitutes an outside influence,
it has clearly rejected certain conduct as constituting outside influence. Id. Thus, it has
been held that information gathered by a juror and introduced to the other jurors by that
juror does not amount to outside influence, even if introduced specifically to prejudice
the jurors' votes. Id. Nor does coercive influence of one juror on the rest of the panel
constitute "outside influence." Id. Even a juror's injection of his own personal
experiences, knowledge, or expertise is not considered an outside influence, because
those representations emanate from inside the jury. Id. A juror's discussion about the
application of the parole law to the defendant's sentence does not constitute an outside
influence. Richardson v. State, 83 S.W.3d 332, 361-62 (Tex. App.–Corpus Christi
2002, pet. ref'd). 

          Where there is no rule 606(b) objection, a jury's discussion of parole constitutes
reversible error when a defendant shows: (1) a misstatement of the law; (2) asserted as
a fact; (3) by one professing to know the law; (4) which is relied upon by other jurors; (5)
who for that reason changed their vote to a harsher punishment. Salazar, 38 S.W.3d at
147 (citing Sneed v. State, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984)). Where
there is conflicting evidence on an issue of fact as to jury misconduct, the trial judge
determines the issue and there is no abuse of discretion in overruling the motion for
new trial. Id. at 148.  

          We generally presume the jury follows the trial court's instructions in the manner
presented. See Williams v. State, 937 S.W.2d 479, 490 (Tex. Crim. App.1996) (jury
presumed to follow court's instructions as given); Waldo v. State, 746 S.W.2d 750, 753
(Tex. Crim. App. 1988) (en banc) (jury presumed to follow instruction to disregard
evidence); Gardner v. State, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987) (en banc); 
see also Luquis v. State, 72 S.W.3d 355, 360 (Tex. Crim. App. 2002) (en banc). 

D. Analysis

          Texas Rule of Appellate Procedure 21.7 allows the trial court in a criminal case
to receive evidence on a motion for new trial by affidavit or otherwise. Tex. R. App. P.
21.7. Viewed in the light most favorable to the trial court's ruling, the two jurors'
affidavits do not reveal any outside influence that was improperly brought to bear on
any juror. The jurors' statements about the effect of parole on Mata's sentence were
clearly statements made by jurors during deliberations and thus emanated from inside
the jury. Inasmuch as the affidavits were evidence concerning the jurors' deliberations
that did not constitute an outside influence, the trial court did not abuse its discretion in
allowing the motion to be overruled by operation of law. 

          On this record, even if the affidavits constitute evidence that the jury discussed
parole during the culpability phase of the trial, Mata has not shown the trial court
abused its discretion. An instruction on the parole law is mandated under article 37.07,
section 4, of the Texas Code of Criminal Procedure. See Tex. Code Crim. Proc. Ann.
art. 37.07 sec. 4 (Vernon Supp. 2004-05). The charge given to Mata's jury substantially
followed the language in the code.


 There is a strong presumption that jurors follow
the court's instructions. Colburn v. State, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998). 
The presumption is rebuttable. 

          Mata argues that the affidavits establish that the jury openly discussed the
effects of parole laws and made an effort to calculate the amount of sentence as
applied to him. To establish reversible error due to the jury's discussion on parole law,
Salazar requires proof of the Sneed factors which are: (1) a misstatement of the law,
(2) asserted as a fact, (3) by one professing to know the law, (4) which was relied upon
by other jurors, (5) who for that reason changed their vote to a harsher punishment. 
Salazar, 38 S.W.3d at 147. Even when the parole law is discussed and the jurors
consider how much time a defendant might actually serve, if no actual misstatement is
made, there is no reversible error. Ortega v. State, 863 S.W.2d 238, 242 (Tex.
App.–Eastland 1993, pet. ref'd). 

          Mata did not obtain a hearing to adduce facts not in the record. As such, the
evidence that the jury discussed parole during deliberations of punishment consists of
the two jurors' affidavits. In virtually identical affidavits, the two jurors stated that (1)
"There was a large discussion surrounding the parole issue and how it would affect this
person," and (2) "After participating in the parole discussion, I changed my verdict to 99
years based on the parole discussion and after having considered parole." The
affidavits do not establish (1) a misstatement of the law, (2) asserted as a fact, (3) by
one professing to know the law, (4) which is relied upon by other jurors, (5) who for that
reason changed their vote to a harsher punishment. Salazar, 38 S.W.3d at 147; Kelley
v. State, 841 S.W.2d 917, 921 (Tex. App.–Corpus Christi 1992, no pet.). The trial court
was free to believe all, some, or none of the affidavits. Charles, 146 S.W.3d at 213. 
Further, Mata did not rebut the presumption that jurors followed the court's instructions
on parole. We conclude that the trial court did not abuse its discretion in denying the
motion for new trial. Kelley, 841 S.W.2d at 921. 

          We overrule Mata's third issue.

VI. CONCLUSION

We affirm the trial court judgment.

ERRLINDA CASTILLO

Justice



Concurring Memorandum Opinion by

Justices Yañez and Garza



Do not publish.

Tex. R. App. P. 47.2(b).



Memorandum Opinion delivered 

and filed this 12th day of May, 2005.