NUMBER 13-07-00581-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

KIRK JOHN NORTHUP, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 36th District Court

of Aransas County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Yañez and Benavides


Memorandum Opinion by Chief Justice Valdez
 

 Appellant, Kirk John Northup, was convicted by a jury of robbery. See Tex. Penal
Code Ann. § 29.02(a) (Vernon 2003). The trial court sentenced Northup to twelve years'
confinement and assessed a $500 fine. By four issues, Northup contends that his trial
counsel provided ineffective assistance, and that the evidence is legally and factually
insufficient to sustain his conviction. We affirm.

I. Background

 In the early morning hours of June 4, 2007, the Aransas County Sheriff's Office
received a 911 call from Casey Peebles, a local cab driver, reporting that he had been
robbed. The Rockport Police Department was notified, dispatched an officer, and began
an investigation. On July 24, 2007, Northup was indicted for aggravated robbery. Trial
commenced on September 5, 2007.

A. The State's Case

 The State's first witness was Patty Dunn, an Aransas County Sheriff's Office
dispatcher. Dunn testified that between three and four o'clock in the morning on June 4,
2007, she received a 911 call from Peebles. As soon as she answered the call, Peebles
stated, "I've been robbed." Dunn testified that Peebles sounded "scared, upset, and
trembling" as he recounted that he had been robbed by a man he had been transporting
in his cab. Peebles told Dunn that he thought the man had a knife. Peebles described the
man as a white male in his mid-thirties, wearing a black shirt and blue jean shorts. Dunn
stayed on the line with Peebles until an officer arrived on the scene.

 Peebles, an employee of City Cab, testified that he was dispatched to Oak Crest
Nursing Home around three o'clock in the morning on June 4, 2007. When he arrived at
the nursing home, a man, who he later identified as Northup, was standing close to the
street in front of the facility. Northup approached the driver's side of the cab and asked to
be taken to Aransas Pass. Northup appeared nervous, so Peebles requested an up front
payment. Northup asked if Peebles had change for a $100 bill. Peebles responded that
he did not, but offered to take Northup to a nearby convenience store for change. Northup
boarded the cab and sat in the front passenger seat. 

 About one quarter of a mile down the road, Northup asked to borrow Pebbles's cell
phone. Peebles obliged and continued driving. After driving less than another one quarter
of a mile, Northup asked Peebles to stop, and stated, "I don't want to hurt you. I just want
your money." Peebles looked at Northup and saw something that resembled a knife or box
cutter in Northup's hand. Peebles complied and gave Northup eighteen dollars. As
Northup exited the cab with the money and Peebles's cell phone, Peebles attempted to
spray him with pepper spray that contained an orange dye. Peebles thought that he had
sprayed Northup, but Northup ran across the street towards the Gulfway Trailer Park. 
Peebles testified that he saw what Northup looked like because of the light provided by
streetlights and a strip of lights attached to the dashboard of his cab. 

 Peebles then testified as to what happened after Officer Yarnall arrived at the
scene. Peebles told the officer that Northup had a tattoo on his left arm and that he
thought that he sprayed Northup with pepper spray. Peebles assisted the officer by
contacting the dispatcher of the cab company to identify the telephone number of the
person who requested the cab. The number was not available on the dispatcher's caller
ID, but the owner of the cab company found it by checking the phone company's website. 
Officer Yarnall returned to his patrol car and conducted a computer search of the telephone
number. Peebles stood outside the patrol car and smoked a cigarette while Officer Yarnall
searched for who the number belonged to. At one point, Peebles saw a picture on the
computer screen that he recognized as the assailant. Upon seeing the picture, he
exclaimed, "That's the individual that robbed me right there." Officer Yarnall identified the
individual as Northup.

 On cross examination, Peebles stated that he had been asleep when the cab
company dispatched him to Oak Crest Nursing Home. He admitted that he never
specifically told police that Northup fled across the street to Gulfway Trailer Park; he
conceded that he had only told the officers that Northup fled in that general direction. He
also admitted that the lights inside his dashboard did not work, and that prior to the
morning of the incident, he installed a strip of lights to the dashboard that provided lighting
in the front seat. Additionally, Peebles stated that when the picture of Northup appeared
on Officer Yarnall's computer, Peebles was not aware of the location to which the
telephone number was attached, and was only aware that the person in the picture was
associated with the telephone number where the cab request had originated.

 Officer Yarnall testified that he received a dispatch at 3:04 a.m. indicating that a
robbery had occurred. Officer Yarnall's testimony concerning the information relayed to
him by Peebles is substantially similar to the testimony given by Peebles. Additionally,
Officer Yarnall testified that after Peebles gave him the telephone number of the call
requesting the cab, he obtained the address associated with the number by asking a police
dispatcher to do a "reverse 911." Officer Yarnall then entered the address into his
computer and a picture of Northup appeared on the screen. He heard Peebles, who was
standing outside the patrol car, say, "That's the guy." Officer Yarnall then went to the
address, a residence located in a nearby trailer park. 

 Between three and four o'clock in the morning, Officer Yarnall arrived at the address
and knocked on the door. A woman, later identified as Linda King, answered and Officer
Yarnall asked her if Northup was there. She responded affirmatively and summoned
Northup. When Northup approached the door, Officer Yarnall asked him to step onto the
porch. Northup refused, opting instead to stand inside the trailer behind a partially opened
door. Officer Yarnall noted that Northup was wearing khaki shorts but was not wearing a
shirt and that Northup's hair and upper body appeared wet. He did not see any pepper
spray burns on the side of Northup's face, and Northup did not appear to be drowsy or
sleepy. 

 On cross examination, Officer Yarnall testified that upon questioning, Northup said
that he had nothing to do with the incident. Northup also told Officer Yarnall that two
"friends," known only as "Denise" and "Jeff" had been in the home "earlier in the evening." 
Officer Yarnall did not ask Northup any additional questions about Denise and Jeff. After
this brief encounter with Northup, Officer Yarnall left the residence, and the case was
assigned to Detective Jerry Lawing.

 Detective Lawing testified that when he arrived at work on the morning of June 4,
2007, he reviewed the offense report with Officer Yarnall. After reviewing the case,
Detective Lawing drafted a complaint and took it to a judge. The judge signed the
complaint and issued an arrest warrant for Northup. On June 5, 2007 at 8:50 a.m.,
Detective Lawing executed the warrant. In the course of the investigation, Detective
Lawing took a statement from Peebles and tried to contact Linda King. Detective Lawing
testified that one day an affidavit from Linda King appeared in his office. He tried to
contact King regarding the affidavit, but she was never at home when he went by the
residence, and she did not return messages that he left on her phone. Consequently, he
was unable to obtain any information concerning Denise and Jeff.

B. The Defense's Case

 King, Northup's sole witness, testified that on June 4, 2007, Northup was her
common law husband, but as of the date of trial, he was her "common-law ex-husband." 
She testified that she was the owner of the Gulfway Trailer Park residence and had
purchased it from Michael Bacon in March 2007. 

 King stated that between two and three o'clock in the morning on June 4, 2007, both
she and Northup were asleep in the living room of the residence because the air
conditioner was not working properly. At approximately 2:00 a.m., she heard a knock at
the door. When she opened the door, a young couple standing at the door asked for
Michael, who formerly owned the residence. King told the couple that Michael no longer
lived there. The couple then introduced themselves as Denise and Jeff. Denise was
"heavy set," approximately five feet two inches tall, of "mixed race," and had dark, curly
hair. Jeff was a white man, approximately five feet eleven inches tall, and "kind of chunky." 
The couple asked King if she would give them a ride; King declined because she did not
know them. King woke Northup and asked him if he would give the couple a ride. Northup
also declined. King invited the couple into her residence to use the phone, and Jeff used
the phone while she, Northup, and Denise sat on the couch. After Jeff made the call he
said, "We have a ride. We have to go." With that statement, the couple departed the
residence.

 King testified that she and Northup then fell back asleep. King awoke a short time
later due to bladder problems and noticed that Northup remained asleep. As she fell back
to sleep, she heard a knock at the door. Upon opening the door, an officer asked to speak
to Northup. When she told the officer that Northup was asleep, he told her to wake him
up. King complied, and Northup went to the door. King testified that she listened to the
conversation between Northup and the officer. The officer asked Northup about his
whereabouts for the last one to two hours and asked if there was anyone else at the
house. King testified that she told Officer Yarnall that two individuals named Jeff and
Denise had been in the residence. Additionally, she testified that after that night, she made
an affidavit and sent it to the police department. However, she did not speak to the police
because Northup told her not to. King then stated that she was not testifying to help
Northup and that her "main concern is not for him; it's for the truth to be known."

 Upon cross examination, King testified that Northup had been her common law
husband for five years but had become her "ex" several months prior to the trial. She
stated, "I get along fine with him; I just don't want to be with him. I'm not in love with him."

C. The State's Rebuttal

 After the defense rested, the State recalled Peebles and Officer Yarnall. Peebles
testified that a "chunky" person did not rob him. Officer Yarnall testified that he did not
speak to King after she woke Northup and that only Northup mentioned Jeff and Denise.

D. Procedural History

 On September 6, 2007, the jury convicted Northup of robbery. The court sentenced
him to twelve years' imprisonment and assessed a $500 fine. On September 17, 2007,
Northup filed a pro se Motion for New Trial and a Notice of Appeal. On September 21,
2007, the Aransas County District Clerk notified Northup's counsel that the motions had
been filed. The Motion for New Trial was overruled by operation of law on November 20,
2007. On November 25, 2007, Northup filed an amendment to his Motion for New Trial.

 On October 26, 2007, Northup's counsel filed a Motion to Withdraw with this Court. 
We transferred the motion to the 36th District Court of Aransas County on November 20,
2007. The district court granted counsel's Motion to Withdraw on November 30, 2007. 
Northup was appointed new counsel for appeal. This appeal ensued. II. Ineffective Assistance of Counsel

 In his first and second issues, Northup contends that he received ineffective
assistance of counsel because his original counsel failed to: (1) request a hearing on his
motion for new trial; and (2) make any argument at the punishment phase of the trial.

A. Standard of Review

 Although the constitutional right to counsel ensures the right to reasonably effective
counsel, it does not guarantee errorless counsel whose competency or accuracy of
representation is to be judged by hindsight. Rylander v. State, 101 S.W.3d 107, 110 (Tex.
Crim. App. 2003). To prove ineffective assistance of counsel, Northup must show that (1)
counsel's performance fell below an objective standard of reasonableness, and (2) there
is a reasonable probability that, but for counsel's error, the result of the trial would have
been different. Strickland v. Washington, 466 U.S. 668, 687 (1984); Andrews v. State, 159
S.W.3d 98, 102 (Tex. Crim. App. 2005); Jaynes v. State, 216 S.W.3d 839, 851 (Tex.
App.-Corpus Christi 2006, no pet.). A failure to make a showing under either prong of the
Strickland standard defeats a claim of ineffective assistance of counsel. Rylander, 101
S.W.3d at 110-11.

 An appellant must prove his claim of ineffective assistance of counsel by a
preponderance of the evidence. Stafford v. State, 813 S.W.2d 503, 506 n.1 (Tex. Crim.
App. 1991). An appellate court's review of defense counsel's representation is highly
deferential, and we presume that counsel's actions fell within the wide range of reasonable
and professional assistance. Bone v. State, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). 
A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. 
State v. Morales, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). Allegations of ineffective
assistance of counsel must be firmly founded in the record. Thompson v. State, 9 S.W.3d
808, 813 (Tex. Crim. App. 1999). The record must sufficiently demonstrate that the acts
or omissions of counsel were not the product of strategic decisions; if the record is silent
as to any explanation for counsel's actions, a reviewing court will find that the defendant
has failed to overcome the strong presumption of reasonable assistance "unless the
challenged conduct was so outrageous that no competent attorney would have engaged
in it." Morales, 253 S.W.3d at 696-97 (quoting Goodspeed v. State, 187 S.W.3d 390, 392
(Tex. Crim. App. 2005)); see Thompson, 9 S.W.3d at 814; Jaynes, 216 S.W.3d at 851. 

B. Failure to Request a Hearing on the Motion for New Trial

 Northup contends that counsel provided ineffective assistance by failing to request
a hearing on the motion after receiving a copy of his pro se motion for new trial. Northup
filed his pro se motion for new trial while he was represented by counsel. An accused has
no absolute right to hybrid representation. See Scheanette v. State, 144 S.W.3d 503, 505
n.2 (Tex. Crim. App. 2004) (holding that a defendant has no right to hybrid representation);
see also Ashcraft v. State, 900 S.W.2d 817, 831 (Tex. App.-Corpus Christi 1995, pet.
ref'd) (holding that a trial court is not required to consider the pro se motion of a defendant
represented by trial counsel). Accordingly, we find that trial counsel was not ineffective for
failing to request a hearing where the trial court was under no obligation to consider the
underlying motion. We overrule Northup's first issue.

C. Failure to Make Argument at Punishment Phase

 Northup's pro se motion for new trial did not include a complaint that trial counsel
was ineffective because of his failure to make arguments at the punishment phase, and
there was no hearing on the motion. "'Trial counsel should ordinarily be afforded an
opportunity to explain his actions before being denounced as ineffective.'" Goodspeed,
187 S.W.3d at 392 (quoting Rylander, 101 S.W.3d at 111). However, a motion for new trial
claiming ineffective assistance of counsel is not always required to preserve that claim.
See Robinson v. State, 16 S.W.3d 808, 809-10 (Tex. Crim. App. 2000). When an
appellant's allegations of ineffective assistance of counsel are firmly founded and
affirmatively demonstrated in the record, no evidentiary hearing is required. See
Castoreno v. State, 932 S.W.2d 597, 605 (Tex. App.-San Antonio 1996, pet. ref'd). 
Therefore, we address whether the record affirmatively demonstrates ineffective assistance
of counsel. 

 During punishment, the State presented evidence of two prior offenses. Although
Northup's counsel did not present any evidence to mitigate the offenses, he requested that
a lesser sentence be imposed. Northup contends that his trial counsel was ineffective for
failing to "make any meaningful argument" at punishment; however, Northup fails to identify
any mitigating evidence that counsel should have presented. Counsel's failure to present
evidence is irrelevant absent a showing that mitigating evidence was available and that
Northup would have benefitted from the evidence. See King v. State, 649 S.W.2d 42, 44
(Tex. Crim. App. 1983) (declining to find counsel ineffective for failing to call witnesses
during punishment where appellant did not demonstrate that witnesses were available or
how he would benefit from their testimony); see also Rangel v. State, 972 S.W.2d 827,
835-36 (Tex. App.-Corpus Christi 1998, pet. ref'd) (declining to find counsel ineffective
where counsel failed to call witnesses during the guilt/innocence phase because appellant
failed to show that there were witnesses available who could have provided helpful
testimony). In the absence of evidence that counsel could have offered at punishment, we
cannot find that counsel's performance was "'so outrageous that no competent attorney
would have engaged in it.'" See Roberts v. State, 220 S.W.3d 521, 533 (Tex. Crim. App.
2007) (quoting Goodspeed, 187 S.W.3d at 392). Accordingly, we overrule Northup's
second issue.

III. Legal and Factual Sufficiency

 By Northup's third and fourth issues, he challenges the factual and legal sufficiency
of the evidence supporting his conviction.

A. Standards of Review and Applicable Law

 In conducting a legal sufficiency review, the reviewing court must ask whether "'any
rational trier of fact could have found the essential elements of the crime beyond a
reasonable doubt'--not whether 'it believes that the evidence at the trial established guilt
beyond a reasonable doubt.'" Laster v. State, 275 S.W.3d 512, 518 (Tex. Crim. App.
2009) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original)). 
We do not reevaluate the weight and credibility of the evidence, and we do not substitute
our own judgment for the trier of fact. King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App.
2000) (en banc); Beckham v. State, 29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.]
2000, pet. ref'd). Instead, we consider whether the jury reached a rational decision. 
Beckham, 29 S.W.3d at 151. We must resolve any inconsistencies in the evidence in favor
of the judgment. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

 In conducting a factual sufficiency review, we review the evidence in a neutral light
to determine whether the evidence is so weak that the jury's verdict seems clearly wrong
and manifestly unjust or the jury's verdict is against the great weight and preponderance
of the evidence. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We
will not reverse the jury's verdict unless we can say with some objective basis in the record
that the great weight and preponderance of the evidence contradicts the verdict. Watson,
204 S.W.3d at 417.

 Under section 29.02 of the Texas Penal Code, a person commits robbery if, "in the
course of committing theft as defined in Chapter 31 and with intent to obtain or maintain
control of the property, he . . . intentionally or knowingly threatens or places another in fear
of imminent bodily injury or death." Tex. Penal Code Ann. § 29.02(a). Chapter 31 of the
Texas Penal Code defines the offense of theft as the unlawful appropriation of property
with the intent to deprive the owner of the property. Id. § 31.03 (Vernon Supp. 2008). 

B. Analysis

 The record indicates Peebles identified Northup as the man who took his money
and cell phone. Peebles testified that he was able to identify Northup because street and
dashboard lights sufficiently illuminated Northup. Peebles first identified Northup shortly
after police arrived on the scene when he saw a picture of a man he recognized as the
assailant appear on Officer Yarnall's computer screen. Peebles testified that upon
boarding the cab, Northup sat in the front passenger seat. After driving a short distance,
Northup asked to use Peebles's cell phone, and although Northup took possession of the
phone, he did not use it. Northup then asked Peebles to stop the car and give him money. 
Peebles testified that he was nervous and that he complied because he noticed that
Northup was holding an object that appeared to be a knife or box cutter. Northup then fled
the car in possession of Peebles's money and cell phone. 

 Officer Yarnall testified that he was able to locate the address and occupants
associated with the residence where the phone call requesting the cab originated. Northup
lived at the residence associated with the telephone number. Officer Yarnall testified that
when he asked Northup whether anyone else was at the residence, Northup stated that
two friends named Denise and Jeff had been at the residence "earlier in the evening." 
Although another occupant of the residence, King, testified that "strangers" identified only
as Denise and Jeff used the phone at the residence to obtain a ride, no additional evidence
was presented as to the identity of the couple. Based on King's testimony, the jury learned
that the man's name was Jeff and that he was "chunky." However, Peebles testified that
the man who took his money and cell phone was not "chunky." 

 Viewing this evidence in the light most favorable to the verdict, we conclude that a
rational trier of fact could have found beyond a reasonable doubt that Northup had the
intent to deprive Peebles of his money and cell phone when he unlawfully appropriated the
property, and intentionally or knowingly threatened or placed Peebles in fear of imminent
bodily injury or death. See Laster, 275 S.W.3d at 518. Viewing the evidence in a neutral
light, we cannot conclude that the evidence is so weak that the jury's verdict seems clearly
wrong and manifestly unjust or that the jury's verdict is against the great weight and
preponderance of the evidence. Watson, 204 S.W.3d at 414-15. We conclude that the
evidence is legally and factually sufficient to support Northup's conviction. We overrule
Northup's third and fourth issues.

IV. Conclusion

 Having overruled all of Northup's issues, we affirm the trial court's judgment.


 ________________________

 ROGELIO VALDEZ

 Chief Justice 

Do Not Publish. Tex. R. App. P. 47.2(b)

Memorandum Opinion delivered and 

filed this the 11th day of June, 2009.